CONSERVATION LAW FOUNDATION; Audubon Society of Rhode Island; Clean Water Action; Concerned Island Residents; DOT Watch; Environment Council of Rhode Island; Save the Bay; Sierra Club; South Kingstown Neighborhood Congress; and West Side Association, Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION; Gordon G. Hoxie, in his official capacity as Division Administrator for the Rhode Island Division of the Federal Highway Administration; Arthur E. Williams, in his official capacity as Chief of Engineers of the U.S. Army Corps of Engineers; and Dante E. Boffi, Jr., in his official capacity as Director of the Rhode Island Department of Transportation, Defendants.

CONSERVATION LAW FOUNDATION; Audubon Society of Rhode Island; Clean Water Action; Concerned Island Residents; DOT Watch; Save the Bay; Sierra Club; South Kingstown Neighborhood Congress; and West Side Association, Plaintiffs,

v.

FEDERAL HIGHWAY ADMINISTRATION; Arthur E. Williams, in his official capacity as Chief of Engineers of the U.S. Army Corps of Engineers; and State Planning Council, Defendants.

Civ. A. Nos. 92–538B, 92–677B.

United States District Court, D. Rhode Island.

July 30, 1993.

John M. Marks, J. William W. Harsch, Providence, RI, Molly Cochran, Sullivan & Worcester, Stephen H. Burrington, Conservation Law Foundation, Boston, MA, for plaintiffs.

Michael P. Iannotti, Asst. U.S. Atty., Providence, RI, Beverly Nash, U.S. Dept. of Justice, Mary Elizabeth Ward, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for Federal defendants.

Andrew M. Hodgkin, William M. Dolan, III, Brown, Rudnick, Freed & Gesmer, Providence, RI, Thomas F. Holt, Jr., Laura Grant Schwartz, Brown, Rudnick, Freed & Gesmer, Boston, MA, for State defendants.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

### I.  Introduction

This litigation stems from the proposed construction of the Jamestown Connector, a four-lane, divided, controlled access highway across the island of Jamestown, Rhode Island which will connect the Jamestown–Verrazzano Bridge and the Pell (Newport) Bridge.[1] Jamestown Island, lies in the middle of Narragansett Bay in what is known by some as the Route 138 corridor, a forty (40) mile stretch of roadways running from I–95 in Richmond, Rhode Island to I–195 in Swansea, Massachusetts. The plaintiffs are the Conservation Law Foundation ("CLF"), Audubon Society of Rhode Island, Clean Water Action, Concerned Island Residents, DOT Watch, Environmental Council of Rhode Island, Save the Bay, Sierra Club, South Kingstown Neighborhood Congress, and West Side Association. Plaintiffs filed two separate actions, which have been consolidated, seeking to enjoin construction of the Jamestown Connector. The defendants are

---

1.  To assist the reader, Appendices A, B, C, and D are attached. Appendix A is a glossary of acronyms; Appendix B is the so called "Route 138 Corridor" as of 1979; Appendix C is the existing road configuration on Jamestown; and, Appendix D is a chart of the four alternative build plans considered.

the Federal Highway Administration ("FHWA"), Gordon G. Hoxie in his official capacity as Division Administrator for the Rhode Island Division of the Federal Highway Administration, Arthur E. Williams in his official capacity as Chief of Engineers of the U.S. Army Corps of Engineers ("the Corps"), Dante E. Boffi, Jr. in his official capacity as Director of the Rhode Island Department of Transportation ("RIDOT"), and the State Planning Council. In total, plaintiffs allege violations of five federal statutes: the National Environmental Policy Act ("NEPA"), the Intermodal Surface Transportation Efficiency Act ("ISTEA"), the Clean Water Act ("CWA"), the Department of Transportation Act ("DOT"), and the Clean Air Act ("CAA").

## II. Factual Background

The history of this highway project dates back to proposed Interstate Highway 895 ("I–895"), which received original approval in December 1969 as part of the Interstate and Defense Highway System. The original proposed 12.1 mile route spanned Narragansett Bay between Warwick and Barrington, Rhode Island. In 1974, FHWA approved a RIDOT proposal which recommended a substitute route. The proposed substitute I–895 essentially tracked Route 138, an undivided roadway dating from the early 1920s, from I–95 in Richmond, Rhode Island to I–195 in either Swansea or Fall River, Massachusetts. Route 138 is the only road crossing Narragansett Bay south of Providence, Rhode Island.[2]

In November 1975, RIDOT initiated an Environmental Impact Statement/Corridor Location Study for designated I–895. In April 1979, RIDOT published the I–895 Draft Environmental Impact Statement ("DEIS"). The 1979 DEIS recognized that Route 138 "was not intended to accommodate the types of vehicles, prevailing operating speeds, and the volumes of traffic" that it then carried. Following the publication of the DEIS, community comment was received at four public hearings. On February 5, 1982, the State of Rhode Island requested withdrawal of proposed I–895 from the Interstate Highway System. On December 30, 1982, FHWA approved Rhode Island's withdrawal request because I–895 was not "essential to the completion of a unified and connected Interstate System." (Fed.Def.Exh. 6.) Much of the proposed I–895 corridor, however, remained eligible for federal funds for substitute projects.

The 1979 DEIS contained a separate section addressing the construction of a Jamestown Bridge replacement structure. Because of its functional obsolescence, increases in traffic volumes, skyrocketing maintenance costs and the need for a completely new concrete deck, RIDOT determined that the existing two-lane Jamestown Bridge needed replacement. The Surface Transportation Act of 1978 specifically allocated discretionary funding under the Highway Bridge Replacement Program to implement the Jamestown Bridge replacement project. As a result, FHWA authorized the development of a site-specific Jamestown Bridge Environmental Impact Statement ("JBEIS"). The JBEIS, completed in May 1981, proposed a four-lane replacement bridge adjacent to the existing bridge and four-lane access roadways extending from Route 1A in North Kingstown to Helm Street on Jamestown.[3]

Following the decision to withdraw I–895, RIDOT continued to examine the need for improvements throughout the Route 138 Corridor. RIDOT's analysis culminated in 1984 with the issuance of a Final Environmental Impact Statement ("FEIS") for the corridor. FHWA approved the FEIS on September 27, 1984. The 1984 FEIS study area encompassed Washington, Newport, and Bristol Counties in Rhode Island, as well as

---

**2.** Route 138 begins in Connecticut, crosses I–95 in Richmond, Rhode Island, proceeds east across Southern Rhode Island, passes over the Jamestown–Verrazzano Bridge, crosses Jamestown Island, and passes over the Pell (Newport) Bridge to Aquidneck Island. Route 138 then follows a generally northern route across Aquidneck Is-

land and connects with Route 24 and eventually with I–195 in Fall River, Massachusetts.

**3.** The Pell (Newport) Bridge, which connects Jamestown Island and Aquidneck Island, is also a four-lane structure.

Swansea, Massachusetts. In Washington County, the FEIS proposed a mixture of upgrades to certain existing portions of Route 138, a no-build option for other portions of Route 138, and construction of new roadways in other areas of the corridor. On Jamestown Island, the FEIS proposed a four-lane reconstruction along the available right of way on Eldred Avenue (1.1 miles) and two possible four-lane alternatives for East Shore Road (1.1 miles). The FEIS recognized that the Jamestown Design Study Committee ("JDSC"), which had been formed in February of 1983, was considering the entire connector roadway system for Jamestown Island. Accordingly, the FEIS contemplated draft and final supplemental EIS documents for the project following decisions by JDSC and RIDOT. On Aquidneck Island, the 1984 FEIS recognized the need for improvements but proposed a no-build alternative and recommended further studies. Finally, the FEIS proposed a no-build option for the East Shore portion of the study area including Bristol County, Rhode Island and Swansea, Massachusetts.

Following the 1984 FEIS, the JDSC convened numerous public meetings on Jamestown and collected community reaction to the proposed cross-island roadway. Based upon community input, the JDSC recommended a conceptual plan to RIDOT in June 1984 which, with certain refinements, became known as Alternative B. Alternative B proposed a controlled access four-lane roadway extending from the Jamestown–Verrazzano Bridge along Eldred Avenue with interchanges at Helm Street and North Road and flowing into a new four-lane roadway located west of East Shore Road extending to the Newport Bridge.

Based on the JDSC's recommendations, RIDOT completed a draft supplemental environmental impact statement ("DSEIS") in April 1986. The FHWA approved the DSEIS on April 22, 1986. The DSEIS considered six alternatives for a cross-island roadway on Jamestown: a No–Build Alternative, the Transportation Systems Management ("TSM") Alternative, two unlimited access roadways (Alternatives A and A1), and two limited access roadways (Alternatives B and C). The DSEIS identified Alternative B, now known as the "Jamestown Connector", as the preferred alternative. RIDOT circulated the DSEIS on May 23, 1986 and held a public hearing at the Jamestown Elementary School on June 26, 1986.

Following the submission of the DSEIS, RIDOT began pursuing necessary permits for Alternative B from the Rhode Island Department of Environmental Management ("RIDEM"). Pursuant to provisions of the Administrative Procedure Act and Rhode Island's Freshwater Wetlands Act, a wetland public hearing was held on February 10, 1987 to resolve issues pertaining to wetland impacts and Alternative B. Following the hearing, RIDOT and RIDEM signed a consent agreement which modified Alternative B to minimize wetlands impact.[4] The RIDEM Wetlands Public Hearing Officer incorporated the conditions of the consent agreement into the final design and order rendered on April 30, 1987. The order specified conditional permit approval to alter freshwater wetlands.

RIDOT completed a final supplemental environmental impact statement ("FSEIS") for the Jamestown Connector in July 1987 and FHWA approved the FSEIS on December 18, 1987. The FSEIS responded to comments received on the 1986 DSEIS and investigated the same six design alternatives, with some modifications, considered by the 1986 DSEIS. According to the FSEIS, traffic safety and drainage concerns rendered the No–Build Alternative and the TSM Alternative not viable. The unlimited access upgrade alternatives, A and A1, failed to separate local and through traffic, failed to maintain highway continuity, permitted continued development along the alignment frontage, and allowed for high traffic volumes, congestion and increasing accident

---

4. Specifically, the consent agreement eliminated two ramps (Ramp G and Ramp H), included a 30 foot grass median for drainage and aesthetic purposes, and provided for an emergency vehicle turnaround in the median. In the vicinity of the North Road intersection, the consent agreement included retaining walls along the mainline of Route 138 and adjusted the profiles of two other ramps (Ramp E and Ramp F).

rates. Alternative C affected the greatest acreage in the Windmill Hill Historic District and failed to attract support from Jamestown residents because of undesirable local access designs. Alternative B, meanwhile, provided the greatest benefits while minimizing adverse impacts to the residents and surrounding environment according to the FSEIS. As a result, the FSEIS identified Alternative B as the preferred alternative. On May 27, 1988, FHWA issued a Record of Decision ("ROD") on the FSEIS which expressly ratified the selection of Alternative B for further project development.

The 1987 FSEIS also found Alternative B to be consistent with six other planned and committed highway projects within the Route 138 Corridor: the I–95 to Route 2 upgrade; the relocation of Route 138 from Route 2 to U.S. 1; the reconstruction of Route 138 from U.S. 1 to the Jamestown Bridge; the Jamestown Bridge Replacement; the Newport Circulator Project; and the Route 138 upgrading along East Main Road from Route 24 to Route 114. The cumulative impacts of the projects located in Washington County and Jamestown (all projects except the Newport Circulator and the East Main Road upgrade) had been previously analyzed in the corridorwide 1979 DEIS and 1984 FEIS.

RIDOT proposed reconstruction of the two-lane roadway from I–95 to Route 2 in three phases. Phase one was completed in 1981 and the other two phases are in the preliminary design stage. RIDOT reevaluated the FEIS for the relocation of Route 138 from Route 2 to U.S. 1 in February 1991 and modified the original alignment. The roadway from Route 1 to the Jamestown Bridge, approved in the 1981 JBEIS, was constructed during 1992. The new Jamestown–Verrazzano Bridge replaced the Jamestown Bridge and opened to traffic on October 19, 1992. The Newport Circulator Project has been replaced by a series of lesser improvements expected to be forwarded with a request for a Finding of No Significant Impact ("FONSI") in Summer 1993. Finally, the FHWA approved improvements to the fourlane East Main Road on December 24, 1991 and selection of a consultant to begin final design is underway.

The 1987 FSEIS also examined impacts to parklands and historic resources governed by Section 4(f) of the Department of Transportation Act ("DOT") and Section 106 of the National Historic Preservation Act. This evaluation focused on the Windmill Hill Historic District and examined four build alternatives, a No–Build Alternative, and an Avoidance Alternative. Although the No–Build Alternative would not impinge upon historic resources, it failed to meet the project goals and was determined to be neither prudent nor feasible. All four of the build alternatives adversely effected the Windmill Hill Historic District. The FSEIS determined that Alternatives A and A1, both fourlane uncontrolled access roadways with at grade intersections, carried far less shortterm impacts on historic resources than the preferred alternative. These alternatives, however, failed to meet traffic service and safety concerns and permitted the possibility of future development which could have a far greater long-term impact on the historic district. The FSEIS determined that Alternative C, a limited access highway on a different alignment, required the use of more historic resources than Alternative B without providing offsetting traffic or safety benefits. Finally, although an Avoidance Alternative, designed to avoid all protected Section 4(f) resources on Jamestown Island, was feasible, the FSEIS determined that it was not prudent because of "a number of disruptive consequences involved in this or any alternative that avoids the Windmill Hill Historic District."[5] Although it found that Alternative A1 caused the least impact to the historic district, the Rhode Island Historical Preser-

---

**5.** The 1987 FSEIS classified problems with the avoidance alternatives into the following categories: environmental and community impacts, costs, public opposition, and long-term effects to the district. The selected "Avoidance Alternative" would have traversed the Cedar Hill Cemetery, requiring reinternment of numerous graves and sparking great public opposition. Further-

more, the Avoidance Alternative's close proximity to the Jamestown Reservoir would greatly increase the potential for pollution of a major source of Jamestown's drinking water. Finally, the Avoidance Alternative required displacement of many private residences causing significant neighborhood disruption.

vation Commission recognized that the separation of through and local traffic achieved with Alternative B necessitated considering this alternative even though it had greater short-term Section 4(f) impacts. The 1987 FSEIS ROD concluded that there was no prudent or feasible alternative to the use of land from the Windmill Hill Historic District and that Alternative B included all possible planning to minimize harm resulting from such use.

On June 8, 1988, FHWA authorized the acquisition of parcels to establish a right-of-way along Eldred Avenue from Seaside Drive to North Road. By November 7, 1990, RIDOT had acquired at least 143 of the 202 parcels necessary to build the Jamestown Connector.

In October, 1986 RIDOT submitted to the Corps the first of a series of applications for a permit for the filling of wetlands in connection with the Jamestown Connector. (Plaintiffs' Exh. 22 and 23.) Although the Corps issued a public notice regarding its permit review for the Jamestown Connector on November 29, 1990, no public hearing was held in connection with the permit application. On May 22, 1992, the Corps completed an Environmental Assessment ("EA") and statement of findings for the purposes of issuing a Section 404 permit to fill wetlands. The EA "considered all factors relevant to th[e] proposal including cumulative effects." The environmental assessment minimized wetlands impacts by replacing the Helm Street overpass with a frontage road to address local access concerns. Based on the evaluation of environmental effects discussed in the 1987 FSEIS, the Corps determined that the "decision on [the Section 404] application [was] not a major federal action significantly affecting the quality of the human environment" and therefore required no separate environmental impact statement. The Corps concluded that Alternative B without the Helm Street overpass was the least environmentally damaging practicable alternative. As a result, on May 21, 1992, the Corps issued a final Section 404 permit authorizing RIDOT to fill approximately 4.6 acres of wetlands to construct the Jamestown Connector.

Throughout and following the Corps permit approval process, the JDSC continued to hold periodic meetings to evaluate additional proposed refinements to the Jamestown Connector design. In a JDSC meeting held on May 7, 1992, Thomas Todd, an architect and Jamestown resident, presented an alternative design featuring an at-grade, signalized intersection at the crossing of Eldred Avenue and North Road. Mr. Todd's conceptual layout included two travel lanes in each direction and separate left and right turn lanes along Eldred Avenue. Minutes of the meeting reflect that Mr. Todd also had contacted the Jamestown Police and had been informed that there had been 213 accidents (78 involving injury) on Route 138 in Jamestown over the previous five year period. Records at the Newport Bridge Toll Plaza indicated that approximately 31 million trips had been made over that same time period. At the same meeting, the JDSC formed an architectural review committee, with Mr. Todd as a member. Over the next six months, RIDOT incorporated certain profile and architectural adjustments suggested by the architectural review committee into the Jamestown Connector design.

FHWA conditionally approved the receipt of bids for the Jamestown Connector on July 31, 1992. Plaintiffs commenced this action on October 8, 1992. RIDOT opened bids for the Jamestown Connector on December 11, 1992. On April 21, 1993, RIDOT issued a conditional notice to proceed with construction activity to its contractor, Tilcon Gammino. After final notice to proceed was given, construction began on May 13, 1993. On May 21, 1993, plaintiffs moved for a temporary restraining order ("TRO") to enjoin further construction. On May 25, 1993, this court granted plaintiffs' TRO application which restrained further construction activity within the frontage road area along Eldred Avenue. The court vacated the TRO on June 8, 1993. Defendants have moved to dismiss plaintiffs' Clean Air Act claim for lack of jurisdiction and failure to state a claim upon which relief can be granted. Plaintiffs, in turn, have moved for summary judgment on their Clean Air Act and Intermodal Surface Transportation Efficiency Act claims. Because these motions raise sub-

stantially the same issues as plaintiffs' application for preliminary injunction, the court defers ruling on them and considers all claims under the preliminary injunction standard.

### III.  Preliminary Injunction Standard

The standard for judicial review of claims requesting a preliminary injunction is well settled.  To succeed on its application, the party seeking a preliminary injunction must demonstrate:

(1) That it does not have an adequate remedy at law and will suffer irreparable harm before the case can be litigated on the merits if the injunction is not granted;

(2) That such harm outweighs any harm that the adverse party will suffer if the injunction is granted;

(3) That it is likely to ultimately succeed on the merits of its claim;  and

(4) That the requested injunction will not adversely affect the public interest.

*Stephen D. DeVito, Jr. Trucking, Inc. v. Rhode Island Solid Waste Management Corp.,* 770 F.Supp. 775 (D.R.I.1991), *aff'd,* 947 F.2d 1004 (1st Cir.1991).  Guided by this standard, the court reviews plaintiffs' claims under each statute separately.

### IV.  Discussion

#### A.  Summary of Claims.

Plaintiffs seek to enjoin construction of the Jamestown Connector.  In total, plaintiffs complaints contain seven counts and allege violations of five federal statutes.  Specifically, plaintiffs allege that:

(1) defendants FHWA, its division administrator Gordon Hoxie, and Dante E. Boffi, Jr., director of RIDOT, have violated NEPA, 42 U.S.C. §§ 4321–4347, by improperly segmenting the Jamestown Connector from other Route 138 Corridor projects and failing to consider the cumulative impacts of such projects (Count 1);

(2) defendant Arthur E. Williams, in his capacity as Chief of Engineers of the U.S. Army Corps of Engineers, has violated NEPA by improperly segmenting the Jamestown Connector from other Route 138 Corri-

dor projects and failing to consider the cumulative impacts of such projects when issuing an environmental assessment concerning the Jamestown Connector (Count 2);

(3) FWHA, Hoxie, and Boffi violated the ISTEA, 23 U.S.C. § 134(*l*), by programming federal funds for highway projects in the Route 138 Corridor without an approved congestion management system (Count 3);

(4) Williams violated § 404 of the CWA, 33 U.S.C. § 1344(a), by issuing a permit for the filling of wetlands in connection with the construction of the Jamestown Connector where there exist "practicable alternatives" to the project (Count 4);  and

(5) FHWA, Hoxie, and Boffi violated § 4(f) of the DOT, 49 U.S.C. § 303(c), by approving construction of the Jamestown Connector and thereby impacting historic sites where there exist "prudent and feasible" alternatives to the project (Count 5); and

(6) and (7) defendants FHWA, Hoxie, and the State Planning Council violated § 176 of the CAA, 42 U.S.C. § 7506(c), by approving a long-range transportation plan and a transportation improvement program that do not "conform" by "contribut[ing] to annual emissions reductions consistent with" 42 U.S.C. § 7511a(b)(1), *see* 42 U.S.C. § 7506(c)(1), (c)(3)(A)(iii), and that defendants FHWA, Hoxie, and Williams have violated § 176 of the CAA by supporting, providing financial assistance for, and issuing a permit for a project that does not come from a conforming transportation plan and transportation improvement program, 42 U.S.C. § 7506(c)(3)(B)(i) (Counts 6 and 7).

#### B.  Plaintiffs' NEPA Claims.

Plaintiffs first contend that defendants have violated the requirements of NEPA, 42 U.S.C. § 4321 *et seq.*  NEPA requires all federal agencies to write EISs for any "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.A. § 4332(2)(C) (1977).  The Supreme Court has recognized that NEPA has twin aims.  *Baltimore Gas & Electric Co. v. NRDC,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983).  First, NEPA "places

upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 553, 98 S.Ct. 1197, 1216, 55 L.Ed.2d 460 (1978). Second, NEPA "ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co.,* 462 U.S. at 97, 103 S.Ct. at 2252. As a result, courts reviewing agency decisions under NEPA generally function "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* at 97–98, 103 S.Ct. at 2252.

■ Section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.,* governs judicial review of an agency's compliance with NEPA. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989); *see also Sierra Club v. Marsh,* 976 F.2d 763, 769 (1st Cir.1992). Under Section 706(2)(A) of the APA, an arbitrary and capricious standard controls judicial review of agency decisions under NEPA. *See Oregon Natural Resources Council,* 490 U.S. at 376, 109 S.Ct. at 1860. Accordingly, a reviewing court "must hold unlawful any agency actions, findings and conclusions that are arbitrary [and] capricious." *Sierra Club,* 976 F.2d at 769. Given this deferential standard of review, the court must afford the agency action a presumption of validity. *Id.* Before deferring to agency action, however, a court must "carefully review[ ] the record and satisfy[ ] [itself] that the agency has made a reasoned decision based on its evaluation" of the available information. *Oregon Natural Resources Council,* 490 U.S. at 378, 109 S.Ct. at 1861.

Plaintiffs make four arguments under NEPA, two against the FHWA and RIDOT and two against the Corps. Plaintiffs first argue that the FHWA and RIDOT violated NEPA by improperly segmenting the Jamestown Connector from other projects in the Route 138 corridor in the 1987 FSEIS. " 'Segmentation' allows an agency to avoid the NEPA requirement that an EIS be pre-

pared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental effects." *Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294, 298 (D.C.Cir.1987). As a general proposition under NEPA, improper segmentation of highway projects for the purposes of preparing EISs is impermissible. *See, e.g., Swain v. Brinegar,* 542 F.2d 364 (7th Cir.1976). FHWA regulations establish a test for evaluating the appropriate scope for a highway project EIS. Specifically, these regulations provide:

[T]he action evaluated in each EIS or finding of no significant impact (FONSI) shall:

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

(2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f) (1992). Courts also have historically applied a test with similar factors. *See Taxpayers Watchdog, Inc.,* 819 F.2d at 298; *see also Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 439 (5th Cir.1981).

■ Applying the first prong of this test to the instant case, the court must determine whether the Jamestown–Verrazzano Bridge and the Newport Bridge are "logical termini" which will be connected by the Jamestown Connector and whether the two mile length of the Connector is sufficient to address environmental matters on a broad scope. An FHWA policy and procedure memorandum has defined "logical termini" as including major crossroads, population centers, major traffic generators, or similar highway control elements. 37 Fed.Reg. 21,810 (1972). Defendants argue that the two bridges which provide access to Jamestown, the Jamestown–Verrazzano Bridge and the Newport Bridge, are highway control elements and therefore logical termini. Plaintiffs, on the other hand, concede that the Newport

Bridge, gateway to the major summer tourist area of Newport, may possibly serve as a logical terminus for the eastern end of the roadway.[6] Plaintiffs contend, however, that the other proper logical terminus is I–95 in Richmond, Rhode Island, the nearest major crossroad and traffic generator west of Jamestown. Plaintiffs argue that the majority of traffic on Jamestown originates in Connecticut and the New York Metropolitan area and crosses the island en route to Newport and Cape Cod.

As an island in the middle of Narragansett Bay, Jamestown presents the court with a somewhat unique situation in terms of geography. The island lies between southeast and southwest Rhode Island. It is approximately nine (9) miles in length, north to south, and about a mile wide, east to west. The proposed connector bisects the island, north and south. An argument can be made that the Jamestown–Verrazzano Bridge acts as a traffic generator or a traffic control device and is therefore a logical terminus. The bridge carries traffic originating from State Route 4, U.S. Route 1, and I–95 from both the north (Providence) and south (New York, Connecticut) onto Jamestown island. Furthermore, although the two mile length of the project is relatively short, the project crosses the entire island from east to west. Given the geography of Jamestown, the project can reasonably be said to be of sufficient length. Although the issue is not clear-cut, the court can say that defendants' conclusion that the Jamestown–Verrazzano Bridge was a logical terminus was not an abuse of discretion.

More importantly, in cases where logical termini are not so easily determined, courts attach only modest weight to the logical termini prong of the FHWA regulations test and the second prong, whether the project has independent utility, becomes the more important inquiry. *Coalition on Sensible Transp., Inc., et al. v. Dole, et al.,* 826 F.2d 60, 69 (D.C.Cir.1987); *Piedmont Heights*

*Civic Club, Inc.,* 637 F.2d at 440. In analyzing the independent utility prong, the "proper question is whether the . . . project serves a significant purpose even if the other related projects, the other segments, are not built for a long time or perhaps not at all." *Save Barton Creek Ass'n v. Fed. Highway Admin.,* 950 F.2d 1129, 1141 (5th Cir.1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992); *see also Coalition on Sensible Transp., Inc., et al.,* 826 F.2d at 69 ("the proper question is whether one project will serve a significant purpose even if a second related project is not built"). Plaintiffs contend that the Jamestown Connector makes sense only as part of a larger plan to improve traffic flow throughout the Route 138 corridor. (Plaintiffs' Trial Brief at 17.) The Administrative Record ("the record"), however, establishes that the project will serve a significant purpose whether or not other projects in the Route 138 corridor are built. The 1987 FSEIS[7] states that the goals of the project are to improve traffic safety, separate through from local traffic, improve traffic capacity and level of service, and limit development of abutting property. (1987 FSEIS pp. 1–28—1–33.) One of the significant stated purposes is to carry transient traffic across the island without affecting local traffic, including school buses and emergency vehicles. Maintenance of the existing ground level unlimited access highway is predicted ultimately to result in summer-long traffic gridlock on the island. All of the project's purposes will be achieved regardless of whether additional construction occurs in the Route 138 corridor. The Jamestown Connector project, therefore, would appear to have the requisite independent utility.

Finally, the third prong of the test requires the court to determine whether the Jamestown Connector will restrict considerations of alternatives for reasonably foreseeable traffic improvements. Any highway project will restrict consideration of related projects to some degree because "future road

---

6. Despite this partial concession, plaintiffs maintained at oral argument that the proper eastern logical termini would have been Route 24 on Aquidneck Island. (See Hearing Transcript, p. 70.)

7. Portions of the 1987 FSEIS are scattered throughout the parties' exhibits. For purposes of clarity and continuity, the court cites to this document as "1987 FSEIS" and lists the relevant page numbers.

projects will have to take into account the traffic facilitated by any given project." *Coalition on Sensible Transp., Inc., et al.*, 826 F.2d at 69. The relevant inquiry, however, is whether "a given project *effectively commits* decisionmakers to a future course of action." *Id.* (emphasis added). The cases cited by plaintiffs demonstrate this proposition.

For example, in *Swain v. Brinegar*, the proposed action was to build the southern section of a highway that would ultimately link Peoria and Lincoln, Illinois. 542 F.2d at 366. The Seventh Circuit noted that "the location of the northern component will be determined because of the placement of the southern component, thus tainting any separate environmental evaluation of the northern component." *Id.* at 370.

Similarly, in *Society for the Protection of New Hampshire Forests, et al. v. Brinegar*, the defendants sought to connect I–93 in Littleton, New Hampshire with I–91 in St. Johnsbury, Vermont. 381 F.Supp. 282, 285 (D.N.H.1974). This link would have created an alternate superhighway route to Canada interrupted only by an eight (8) mile stretch of road along the path of I–93 in the vicinity of Franconia State Park in what is known as Franconia Notch. The court found that creating this alternate route would "exert irresistible pressure on [ ] highway planners" to complete the missing link of I–93 through Franconia Notch. *Id.* at 285–86.

These cases can be distinguished from the instant case. Unlike the southern section of the proposed highway in *Swain*, the proposed Jamestown Connector is not a "road to nowhere." The project would be a four lane highway sandwiched between the two bridges that provide access to and egress from the island. To a certain degree, the bridges insulate the Jamestown Connector from other potential projects within the Route 138 corridor. For example, the positioning of the existing bridges already restricts consideration of alternatives for the location of other projects to the immediate east or west of Jamestown. In reviewing the record for preliminary injunction purposes, the court finds no evidence that completion of the Jamestown Connector would compel adoption of the other "planned and committed" projects in the Route 138 corridor. There is no evidence that there is a "current, irretrievable appropriation of money for any proposed extension" of the Jamestown Connector. *Macht v. Skinner*, 715 F.Supp. 1131, 1136 (D.D.C.1989), *aff'd*, 889 F.2d 291 (D.C.Cir.1989). For these reasons, the Jamestown Connector would not appear to restrict considerations of alternatives for reasonably foreseeable traffic improvements. Under the FHWA regulations test therefore, the court cannot label the defendants' decision concerning the scope of the Jamestown Connector as arbitrary and capricious.

■ Plaintiffs also contend that FHWA and RIDOT failed to analyze the cumulative impacts of the Route 138 projects in the 1987 FSEIS. Council on Environmental Quality ("CEQ") regulations define cumulative impact as the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7 (1992). A meaningful cumulative-effects evaluation identifies:

(1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, proposed, and reasonably foreseeable— that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Fritiofson v. Alexander*, 772 F.2d 1225, 1245 (5th Cir.1985). A full-blown environmental analysis of the impacts of other actions, however, is not required. *Id.* at 1245 n. 20. An underlying database that includes approved and proposed projects satisfies the "statutory minima" of NEPA. *Piedmont Heights Civic Club, Inc.*, 637 F.2d at 441.

The 1987 FSEIS concluded that the Jamestown Connector was consistent with six other planned and committed projects in the Route 138 corridor. *See supra* at 875. The 1987 FSEIS also referenced the analysis of the cumulative impacts of the Washington County and Jamestown projects in both the 1979 DEIS and the 1984 FEIS. Plaintiffs apparently would have defendants duplicate

this analysis for the 1987 FSEIS. Defendants argue that plaintiffs' contention "misconceives both the CEQ regulation and the purpose of NEPA." *Coalition on Sensible Transp., Inc.*, 826 F.2d at 70. The court is satisfied that 1987 FSEIS, which expressly identified other projects in the Route 138 corridor, sufficiently "alert[ed] interested members of the public to any arguable cumulative impacts involving these other projects." *Id.* at 71.

Defendants with justification assert that the scope of the 1987 FSEIS demonstrates proper tiering of environmental analysis. CEQ regulations encourage agencies "to tier environmental impact statements to eliminate repetitive discussions." 40 C.F.R. § 1502.20 (1992). Following the preparation of a broad EIS, an agency may then prepare a subsequent EIS for site specific actions within the scope of the original EIS. *Id.* The subsequent EIS need only summarize and incorporate by reference discussions from the broader EIS and indicate where the broader EIS is available. *Id.* Adopting this concept, FHWA regulations provide:

> (g) [f]or major transportation actions, the tiering of EISs as discussed in the CEQ regulation (40 CFR 1502.20) may be appropriate. The first tier EIS would focus on broad issues such as general location, mode choice, and areawide air quality and land use implications of the major alternatives. The second tier would address site-specific details on project impacts, costs, and mitigation measures.

23 C.F.R. § 771.111(g) (1992).

The environmental analysis of the Jamestown Connector was properly tiered. The 1979 DEIS analyzed the entire Route 138 corridor. Furthermore, the 1984 FEIS analyzed the projects in Washington County and Jamestown. The 1984 FEIS proposed a four-lane reconstruction along Eldred Avenue and two four-lane alternatives for East Shore Road. In doing so, the 1984 FEIS identified the general location and mode choice for what would become the Jamestown Connector. The 1984 FEIS also acknowledged the ongoing work of the JDSC and contemplated both draft and final supplemental EISs for the Jamestown Connector. The 1987 FSEIS addresses site-specific details and properly references the 1979 DEIS and the 1984 FEIS. Accordingly, the process followed by defendants for the environmental review of the Jamestown Connector demonstrated proper tiering of EISs. After carefully assessing plaintiffs arguments, the court concludes that defendants took the necessary "hard look" at the Jamestown Connector project required by NEPA. *See Fritiofson*, 772 F.2d at 1238.

Plaintiffs also contend that the Corps violated NEPA by artificially segmenting and failing to consider cumulative impacts of the Route 138 corridor projects. In reviewing a permit to fill wetlands under § 404 of the CWA, the Corps must comply with NEPA's requirements. *Id.* at 1229. In determining whether the environmental effects of a proposed project require the preparation of an EIS or result in a finding of no significant impact ("FONSI"), CEQ regulations permit an agency to prepare a preliminary "Environmental Assessment" ("EA"). *Sierra Club v. Marsh*, 769 F.2d 868, 870 (1st Cir.1985). The regulations describe an EA as a concise public document that provides sufficient analysis of a proposed project and its alternatives. 40 C.F.R. § 1508.9 (1992).

In the instant case, the EA prepared by the Corps resulted in a finding of no significant impact ("FONSI"). (Fed.Def.Exh. 142 ¶ 10.) The Corps' EA included provisions to minimize wetlands impacts and the final permit allowed the filling of 4.6 acres of wetlands. Plaintiffs challenge the scope, and not the substance, of the Corps' decision. The EA specifically references the evaluation of environmental effects discussed in the 1987 FSEIS. (Fed.Def.Exh. 142 ¶ 10.) The EA also expressly states that the Corps "considered all factors relevant to the proposal including cumulative impacts." (Fed.Def.Exh. 142 ¶ 11.) Given the underlying database considered by the Corps, the court's analysis of plaintiffs' NEPA claims against the Corps mirrors the analysis of the plaintiffs' claims against FHWA and RIDOT. Accordingly, for the reasons stated above, the Corps' decision as to the scope of the EA was not arbitrary and capricious. In sum, plaintiffs have failed to demonstrate a likelihood of

success on the merits of their NEPA claims and the application for preliminary injunction is denied as to those claims.

### C. Plaintiffs' Section 4(f) Claims.

■ Plaintiffs also allege that defendants have violated Section 4(f) of the Department of Transportation Act ("DOT"). 49 U.S.C. § 303. The DOT provides, in part, that:

> (c) [t]he Secretary [of Transportation] may approve a transportation program or project ... requiring the use of publicly owned land of ... an historic site of national, State, or local significance ... only if—

> (1) there is no prudent and feasible alternative to using that land; and

> (2) the program or project includes all possible planning to minimize harm to the ... historic site resulting from the use.

49 U.S.C.A. § 303(c) (Supp.1993).

In *Citizens to Preserve Overton Park, Inc. v. Volpe,* the Supreme Court established three factors to guide judicial review under Section 4(f). 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). First, a court must "decide whether the Secretary acted within the scope of his authority." *Id.* at 415, 91 S.Ct. at 823. In making this decision, "the reviewing court must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." *Id.* at 416, 91 S.Ct. at 823. Next, Section 706(2)(A) of the APA requires the court to determine whether "the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* Although "this inquiry into the facts is to be searching and careful ... [t]he court is not empowered to substitute its judgment for that of the agency." *Id.* Finally, a reviewing court must decide "whether the Secretary's action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. at 824.

The 1987 FSEIS Section 4(f) Evaluation ("Evaluation") examined four (4) build alternatives, a No–Build Alternative and an Avoidance Alternative. Any alternative that also uses historic site land is not an "alternative to using that land" under Section 4(f). *See Coalition on Sensible Transp., Inc., et al. v. Dole, et al.,* 642 F.Supp. 573, 597 (D.D.C. 1986), *aff'd,* 826 F.2d 60 (D.C.Cir.1987). Because build Alternatives A, A1, and C each use land in the Windmill Hill Historic District they are not alternatives under Section 4(f). *Id.* Plaintiffs contend that three other alternatives, the No–Build Alternative, the TSM Alternative and the Todd Alternative are both feasible and prudent.

In general, the Secretary cannot reject alternatives to the use of historic land as imprudent unless there are "truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reach[es] extraordinary magnitudes.". *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 413, 91 S.Ct. at 822. Subsequent decisions, however, have permitted the Secretary to reject projects "as imprudent for failure to fulfill the traffic needs of a highway project." *Coalition on Sensible Transp., Inc., et al.,* 642 F.Supp. at 598; *but see Stop H–3 Ass'n v. Lewis,* 740 F.2d 1442, 1455 n. 21 (9th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). The Evaluation states:

> [t]he No–Build alternative is not a prudent and feasible alternative for achieving the goals of this project. With the expected 80 percent growth in traffic over the next 20 years, existing levels of service of E and F ... are expected to deteriorate even further. Existing deficiencies in roadway geometry contribute to reduced sight and stopping distances, resulting in an increase in accident rates. Increased traffic volumes, and the potential for development of adjoining land parcels ... will result in even higher accident rates. Under the No–Build alternative necessary watershed protection measures are not possible....

(1987 FSEIS, p. 4–155, 4–156.) This discord between the project's goals and the No–Build

Alternative permits the Secretary to properly reject the alternative as imprudent. *Coalition on Sensible Transp., Inc., et al.,* 642 F.Supp. at 598.

The Transportation System Management ("TSM") Alternative was not specifically addressed in the Evaluation portion of the 1987 FSEIS. The Evaluation states, however, that the "No–Build alternative was deleted from further consideration early in the selection process and is retained here to serve as a baseline for comparative purposes only." (1987 FSEIS at 4–156.) The TSM alternative was also deleted at an early stage. The "Alternatives" section of the 1987 FSEIS explains that improvements typically considered for TSM Alternatives include fringe area parking lots, transit, car pooling, traffic signal timing adjustments, traffic operation improvements, and reconstruction of existing roadways. (1987 FSEIS at 2–4.) The TSM Alternative was deleted because of the nature of the existing and projected traffic on Route 138. *Id.* A large percentage of Jamestown traffic is through traffic originating in Connecticut, New York and New Jersey and heading for the tourist areas of Newport and Cape Cod. *Id.* As a result, weekend and summer traffic volumes are much greater than non-summer weekday traffic. *Id.* Because TSM improvements generally succeed in urban areas with large population centers, the TSM Alternative was deleted from consideration. *Id.* The 1987 FSEIS identifies traffic level of service, traffic safety and watershed concerns among the reasons for rejecting the TSM Alternative as inconsistent with the project's goals. *See Coalition on Sensible Transp., Inc., et al.,* 642 F.Supp. at 598.

The Evaluation also considered an Avoidance Alternative which would circumvent the historic site. Any Avoidance Alternative alignment north of Eldred Avenue would cross a cemetery, requiring the reinternment of numerous graves. (1987 FSEIS at 4–162.) Any alignment north of Eldred Avenue would also encroach upon the Jamestown Reservoir, presenting potential drinking water pollution problems. *Id.* Finally, along East Shore Road, this alternative would displace many private residences causing significant community disruption. *Id.* Thus, it appears that any of the Avoidance Alternatives involve "truly unusual factors" and "community disruption" and were properly rejected as imprudent. *See Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 413, 91 S.Ct. at 822.

Plaintiffs also contend that the Todd Alternative is feasible and prudent. Plaintiffs' contention must fail. Because the Todd Alternative actually uses land in the Windmill Hill Historic District, it cannot be an "alternative to using [historic district] land" under Section 4(f). *See Coalition on Sensible Transp., Inc., et al.,* 642 F.Supp. at 597. Furthermore, as discussed below, even if the Todd design were an alternative to using district land, it would be properly rejected as imprudent because it is inconsistent with the project's goals, particularly the segregation of transient and local traffic.

■ Having determined that the Secretary reasonably concluded that no feasible and prudent alternatives existed, the court now must determine whether the selection of Alternative B was based on a consideration of relevant factors and whether there was a clear error of judgment. *See Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416, 91 S.Ct. at 823–24. Section 4(f)(2) of the DOT requires a proposed project using protected lands to include "all possible planning to minimize harm." 49 U.S.C. § 303(c)(2). Generally speaking, "[S]ection 4(f)(2) requires a simple balancing which totals the harm caused by each alternate route." *Druid Hills Civic Ass'n v. Fed. Highway Admin.,* 772 F.2d 700, 716 (11th Cir.1985). The Secretary retains discretion to choose among alternatives with substantially equal impacts to historic sites. *Id.* The Secretary may also reject a route, although it minimizes harm, if that route is infeasible or imprudent. *Id.; see also Coalition on Sensible Transp., Inc., et al.,* 642 F.Supp. at 599.

The Section 4(f) Evaluation rejected Alternative C because, among other reasons, it used the most land, 24 acres and two structures, in the historic district. (1987 FSEIS at 4–159.) Under a balancing which totals the harm caused by each alternative, Alternative C was properly rejected. *See Druid*

*Hills Civic Ass'n,* 772 F.2d at 716. Alternatives A and A1 harmed the historic district the least, 10.6 acres and 3.4 acres respectively. (1987 FSEIS at 4–157.) The Evaluation recognized, however, that future roadside development along these uncontrolled access roadways posed long-term threats to the Windmill Hill Historic District. *Id.* Moreover, these alternatives were rejected as imprudent because of poor levels of service, traffic safety concerns, failure to separate local and through traffic, and social concerns. *Id.* In short, Alternatives A and A1 also failed to meet the projects goals, a proper basis for rejecting alternatives as imprudent. *See Coalition on Sensible Transp., Inc., et al.,* 642 F.Supp. at 598. The signature feature of the Todd Alternative is an at-grade signalized intersection at Eldred Avenue and North Road. Accordingly, even if it were to be considered, the Todd Alternative contains the same feature, an at-grade signalized intersection, which prompted the rejection of Alternatives A and A1 for traffic congestion and safety reasons.

Although Alternative B will impact 16.8 acres of historic district land in the short-term, the controlled access nature of the alternative will provide greater long-term benefits by precluding roadside development. (1987 FSEIS at 4–158.) According to the Evaluation, Alternative B also will improve safety for pedestrians, bicyclists and local traffic, attain efficient traffic flow, eliminate hazardous intersections, and improve access to local areas for emergency vehicles. *Id.* Furthermore, the Rhode Island Historical Preservation Commission recognized the necessity of considering Alternative B despite its greater short-term impacts on the historic district. (Fed.Def.Exh. 163.)

The Evaluation also examined design elements to reduce the impact on the historic district. (1987 FSEIS at 4–165.) As a result, the redesigned Alternative B eliminated an overpass at Helm Street, eliminated Ramps G and H, eliminated the West Service Road Extension, and incorporated steps to minimize the visual impact of the project.

*Id.* Given the analysis set forth in the Section 4(f) Evaluation, the court finds no error of judgment in selecting Alternative B. *See id.*

Finally, the plaintiffs do not contend, nor does the court detect, that the Secretary's action failed to follow necessary procedural requirements. *See Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 417, 91 S.Ct. at 824. The Evaluation's conclusion that "all other alternatives have unique problems or inherent costs of extraordinary magnitude that render them not prudent and feasible" appears to be reasonable. (1987 FSEIS at 4–167.) Accordingly, under the statutory language of Section 4(f) and the framework for analysis established by the Supreme Court, the Section 4(f) Evaluation for the Jamestown Connector passes muster. The application for preliminary injunction therefore, is denied as to plaintiffs' Section 4(f) claims because plaintiffs have failed to show a likelihood of ultimate success on the merits on those claims.

### D. *Plaintiffs' ISTEA Claims.*

■ Plaintiffs also assert that FHWA, Hoxie and Boffi have programmed federal funds for Route 138 corridor projects in violation of the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"; phonetically referred to as "ice-tea", the court is told). 23 U.S.C.A. § 134 (Supp.1993). Plaintiffs focus their argument on a portion of the statute that provides:

[n]otwithstanding any other provisions of this title or the Federal Transit Act, for transportation management areas classified as nonattainment for ozone or carbon monoxide pursuant to the Clean Air Act, Federal funds may not be programmed in such area for any highway project that will result in a significant increase in carrying capacity for single-occupant vehicles [SOVs] unless the project is part of an approved congestion management system.

*Id.* at § 134(*l*). Rhode Island, a transportation management area ("TMA"),[8] has been

---

**8.** ISTEA required the Secretary of Transportation to "designate as transportation management areas all urbanized areas over 200,000 popula-

tion." 23 U.S.C.A. § 134(i)(1) (Supp.1993). In accord with ISTEA's directives, the Secretary

designated as nonattainment for ozone and, therefore, an approved congestion management system is a prerequisite for programming Federal funds for highway projects under ISTEA. 56 Fed.Reg. 56,694, 56,823 (1991). The statute defines a congestion management system ("CMS") as follows:

> Within a transportation management area, the transportation planning process under this section shall include a congestion management system that provides for effective management of new and existing transportation facilities eligible for funding under this title and the Federal Transit Act through the use of travel demand reduction and operational management strategies. The Secretary shall establish an appropriate phase-in schedule for compliance with the requirements of this section.

23 U.S.C.A. § 134(i)(3) (Supp.1993).

Pursuant to ISTEA's directives, the Secretary issued an Interim Guidance on ISTEA Metropolitan Planning Requirements on April 23, 1992. 57 Fed.Reg. 14,943 (April 23, 1992). This Interim Guidance provides that "[f]or phase 1 of the phase-in schedule, a currently self-certified planning process in conjunction with the NEPA process can constitute an interim congestion management system." Id. at 14,948. The Interim Guidance then provides a laundry list of requirements for interim CMSs. Id. The Interim Guidance goes on to state that "in TMAs that are nonattainment areas, the MPO [metropolitan planning organization] and State may not advance a project that provides a significant capacity increase for single-occupant vehicles unless they can demonstrate that they have a mechanism in place that meets [interim CMS] criteria." Id. However, "[p]rojects that have advanced beyond the NEPA process and which are being implemented, e.g., right-of-way acquisition is in process, will be deemed to be programmed and not subject to this requirement." Id. (emphasis added).

The Jamestown Connector project is beyond the NEPA process. FHWA issued a

designated Rhode Island a transportation management area. 57 Fed.Reg. 21,160 (1992).

Record of Decision on May 27, 1988 giving final approval for the Jamestown Connector. The Jamestown Connector project is also being implemented. As of April 23, 1992, the date of the Interim Guidance, RIDOT had acquired nearly all of the parcels necessary for the right-of-way to construct the Jamestown Connector. Accordingly, the Jamestown Connector is deemed to be programmed under the Interim Guidance and ISTEA's requirements do not apply to the project. Both parties nevertheless offer very technical arguments as to whether Rhode Island presently maintains a compliant CSM or interim CSM. ISTEA is an act of recent vintage. As such, case law interpreting the statute is sparse and agency regulations are not yet in place.[9] Rather than engaging in a sophisticated exercise of statutory construction, the court finds that the plain language of the Interim Guidance, which exempts projects such as the Jamestown Connector from compliance with ISTEA, precludes plaintiffs from making the necessary showing of a likelihood of success on the merits of their ISTEA claim. As a result, plaintiffs application for preliminary injunction under ISTEA is denied.

### E. Plaintiffs' Claims under Section 404 of the CWA.

Section 404 of the Clean Water Act ("CWA") provides in part that "[t]he Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters...." 33 U.S.C.A. § 1344(a) (1986). Two sets of regulations simultaneously guide the Section 404 permit process, Corps regulations, 33 C.F.R. Parts 320–29, and EPA guidelines, 40 C.F.R. Part 230. Hough v. Marsh, 557 F.Supp. 74, 81 (D.Mass.1982). Once again, under the APA standard, courts reviewing permit Section 404 decisions must determine whether the Corps' action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. at 79 (quoting 5 U.S.C. § 706(2)(A)). The Corps regulations provide

9. Recently proposed regulations would not require an approved CMS to be in place until October 1, 1995. 58 Fed.Reg. 12,121–22 (March 2, 1993).

in part that "[n]o permit will be granted which involves the alteration of wetlands ... unless the district engineer concludes, on the basis of the analysis required in paragraph (a) of this section, that the benefits of the proposed alteration outweigh the damage to the wetland resource." 33 C.F.R. § 320.-4(b)(4) (1992). The regulations further state that in conducting a permit evaluation, "the district engineer shall apply the section 404(b)(1) guidelines (40 CFR part 230.-10(a)(1), (2), (3))." *Id.* The referenced section 404(b)(1) guidelines provide in part that "no discharge of dredged or fill material shall be permitted *if there is a practicable alternative* to the proposed discharge which would have less impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a) (1992) (emphasis added). Plaintiffs allege that the Corps improperly approved the Section 404 permit for the Jamestown Connector because practicable alternatives existed.

A practicable alternative under the section 404(b)(1) guidelines is one that "is available and is capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes.*" 40 C.F.R. § 230.10(a)(2) (1992) (emphasis added). Courts have held that the Corps may properly consider factors such as cost and logistics and "has a duty to consider the applicant's purpose." *See Sylvester v. U.S. Army Corps of Engineers,* 882 F.2d 407, 409 (9th Cir.1989); *see also Louisiana Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1048 (5th Cir.1985) (per curiam). For projects such as the Jamestown Connector that are not "water dependent", "practicable alternatives that do not involve special aquatic sites [10] are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.-10(a)(3) (1992). This presumption does not "bar [the] issuance of a permit ... [it] simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives." *Louisiana Wildlife Fed'n, Inc. v. York,* 603 F.Supp. 518, 527, *aff'd in part and vacated in part,* 761 F.2d 1044 (5th Cir.1985). Plaintiffs contend that the No–Build, TSM and Todd alternatives were all practicable

alternatives under the section 404(b)(1) guidelines.

The Corps' regulations indicate that "[m]ost permits will normally require only an EA" and not an EIS. 33 C.F.R. § 230.7 (1992). The Corps prepared an EA for the Jamestown Connector and determined that preparation of an EIS was not necessary. (Fed.Def.Exh. 142.) The EA reflects that the Corps was a cooperating agency in the preparation of the 1987 FSEIS. *Id.* at ¶ 10. The Corps was entitled to reasonably rely upon the evaluation of alternatives contained in the 1987 FSEIS so long as the Corps properly supplemented that evaluation. *See Town of Norfolk, et al. v. U.S. Army Corps of Engineers,* 968 F.2d 1438, 1448 (1st Cir. 1992). As discussed earlier in this opinion, the 1987 FSEIS considered the No–Build and TSM alternatives and rejected them as inconsistent with the goals of the Jamestown Connector. The court will not repeat the 1987 FSEIS's analysis. The specific reasons given for rejecting these alternatives also appear in parts of the Corps' administrative record. RIDOT's initial permit application to the Corps states that "heavy traffic and congestion has caused high accident rates" and that "[f]uture projections of traffic volumes indicate further deterioration of the traffic operations and continued hazards from the mixing of local and through traffic." (Fed.Def.Exh. 64.) The application also indicates the project was needed "to alleviate these conditions and provide for future public safety." *Id.* RIDOT's revised permit application reiterates and further expands on these concerns. (Fed.Def.Exh. 83.) The Corps' responses to public comment indicate the Corps' awareness of "a documented public safety need to separate local from through traffic to reduce the incidence of vehicular accidents due to existing traffic volumes and congestion" and a need "to provide closed drainage on the island." (Plaintiffs' Exh. 64, at 23.) The record also reflects an abundance of raw data, such as traffic studies, accident rates, etc., to support the Corps' conclusions as to the project's purposes. In

---

**10.** Wetlands are "special aquatic sites" for the purposes of the section 404(b)(1) guidelines. 40

C.F.R. §§ 230.3(q–1), 230.41 (1992).

short, the record reflects that the Corps properly supplemented the 1987 FSEIS and properly considered the incompatibility of the No–Build and TSM alternatives with the project's purpose in the permitting process. *See Sylvester,* 882 F.2d at 409.

Plaintiffs also contend that replacing the North Road overpass with an at-grade intersection, as featured in the Todd design, was a practicable alternative overlooked by the Corps. Although the Corps did not consider the Todd Alternative, which was not presented to it at the time, the Corps did evaluate the possibility of an at-grade intersection at North Road and Eldred Avenue in conjunction with Alternatives A and A1. (Fed. Def.Exh. 133.) The at-grade intersection impacted 2.4 acres of wetlands compared to 4.6 acres impacted by the approved Jamestown Connector. *Id.* Despite this reduction in wetland impacts, the alternative was deemed not practicable because it created "traffic congestion and safety concerns by mixing . . . cross-island . . . [and] local traffic" and therefore did not "conform to the stated purpose and need for the project." *Id.; see also* (Fed.Def.Exhs. 72, 74.) Plaintiff dismisses this evaluation arguing the Corps should have considered a "hybrid" alternative featuring an otherwise controlled access highway with an interchange at North Road. Such a "hybrid", however, would still result in the blending of through and local traffic at North Road in contradiction of the project's goals.

The Corps also required wetlands mitigation measures to reduce the impacts on wetlands from 13 acres (original Alternative B) to 4.6 acres (modified Alternative B). (Fed. Def.Exhs. 68, 69, 88, 143.) Having properly reviewed the record and considered relevant factors including project purposes, nothing more was required of the Corps in evaluating practicable alternatives. *See Sylvester,* 882 F.2d at 410. Accordingly, the Corps' decision that the Jamestown Connector (modified Alternative B) "was the least environmentally damaging practicable alternative" was not arbitrary and capricious. (Fed.Def.Exh. 142.)

Plaintiffs also contend that the Corps failed to conduct a proper public interest review. The Corps must decide whether to issue a Section 404 permit "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. 320.4(a)(1) (1992). Specifically, plaintiffs claim that the Corps failed to consider the impacts of the Helm Street overpass, which was eliminated from the modified version of Alternative B. Inclusion of the Helm Street overpass increases the impacts on wetlands from 4.6 acres to 8.3 acres. (Plaintiffs' Exh. 24.) Plaintiffs maintain that RIDOT and FHWA agreed to eliminate the Helm Street overpass with the intention of constructing it later as part of a separate action. Plaintiffs cite statements in the administrative record which indicate agency plans to defer construction of the overpass. (Plaintiffs' Exhs. 50, 51, 76, 77.) Failure to consider the impacts of the Helm Street overpass, according to plaintiffs, constitutes a failure to consider cumulative impacts as required by the regulations.

The court disagrees. The Corps thoroughly examined the Helm Street overpass, to the point where its elimination was required. (Fed.Def.Exh. 142 at 4.) Plaintiffs' argument, taken to its logical conclusion, would allow future plaintiffs to challenge any portion of a project which has been eliminated but not completely purged from the minds of highway planners. Such a result would halt virtually any highway project.

As it stands now, the Jamestown Connector will pass Helm Street at ground level and a frontage road, within the footprints of the previously proposed onramps, will replace the overpass to provide local access. *Id.* There are substantial barriers to any potential revival of the Helm Street overpass. First and most importantly, the Corps' Section 404 permit required its elimination. In fact, prior to the elimination of the Helm Street overpass, the EPA was on record as recommending denial for Alternative B. (Plaintiffs' Exh. 51.)[11] Beyond that, con-

11. The EPA retains authority to override the issuance of a section 404 permit. (Plaintiffs' Exh. 51.)

struction of the overpass will require removal of the frontage road and reversal of conservation easements on the north side of Eldred Avenue near Helm Street.

The EA stated that, as required by the regulations, the Corps:

> considered all factors relevant to this proposal including cumulative effects. Potential factors included conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, consideration of property ownership and, in general, the needs and welfare of the people. After weighing favorable and unfavorable effects as discussed in this document, [the Corps] find[s] that this project is not contrary to the public interest and that a Department of the Army permit should be issued.

(Fed.Def.Exh. 142); 33 C.F.R. § 320.4(a)(1) (1992). The Corps' consideration of these factors is adequately supported by the record. Accordingly, the Corps properly conducted the required public interest review.

Finally, plaintiffs contend that the Corps' determination not to hold a public hearing violated the section 404(b)(1) guidelines. The guidelines provide that "any person may request, in writing, . . . that a public hearing be held to consider the material matters at issue in the permit application or with respect to the Federal project." 33 C.F.R. § 327.4(b) (1992). Such requests must state "with particularity the reasons for holding a public hearing." *Id.* In response, "the district engineer may expeditiously attempt to resolve the issues informally." *Id.* Otherwise, a public hearing will be held "unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." *Id.*

The Corps issued a Public Notice for the Jamestown Connector section 404 permit application on November 29, 1990. (Fed. Def.Exh. 92.) In response, the Corps received 158 letters, 6 of which requested a public hearing. (Fed.Def.Exh. 139.) In its Determination of Need for a Public Hearing, the Corps listed 11 areas of concern raised in conjunction with hearing requests. *Id.* The Corps also indicated that, since the issuance of the Public Notice, the Helm Street overpass was eliminated, a closed drainage system was included, posted speeds were reduced to 40 m.p.h. and archeological sites were investigated. *Id.* These developments addressed many of the concerns expressed by those requesting a hearing. *Id.* Furthermore, the Corps held "several meetings with local groups including the Town Council to hear the concerns." *Id.* The Corps concluded that additional information that was required "appears to be technical in nature and unlikely to be brought forward during a public hearing." *Id.* Accordingly, the Corps determined that a public hearing was not warranted. *Id.*

After reviewing the record, the court is satisfied that the Corps complied with the "strong congressional desire that the public have input in decisions concerning the elimination of water pollution." *See Costle v. Pacific Legal Found.,* 445 U.S. 198, 215, 100 S.Ct. 1095, 1105, 63 L.Ed.2d 329 (1980). The Corps attempted to resolve certain issues informally through meetings with various groups. *See* 33 C.F.R. § 327.4(b) (1992). These meetings addressed many of the concerns raised by those requesting hearings including the width of the road, the excessive size of the road, the Helm Street overpass, the least environmentally damaging practicable alternative, and piecemealing Interstate 895. (Fed.Def.Exhs. 97, 109, 131.) Throughout the public comment period, the Helm Street overpass, which was eliminated, remained the most controversial issue. Moreover, the Corps extended the public comment period and accepted and responded to comments submitted long after the extended deadline of January 31, 1991. (Fed.Def.Exh. 93.) Given the informal meetings held by the Corps and the preclusion of issues by developments occurring after the Public Notice, the court finds no reason to conclude that the Corps' decision not to hold a public hearing was an abuse of discretion. Plaintiffs have not demonstrated that they are likely to ulti-

mately succeed on the merits of their CWA claims. The application for preliminary injunction as to the CWA claims must be denied.

## F. Plaintiff's CAA Claims.

Finally, plaintiffs allege that defendants have violated portions of the recently promulgated Clean Air Act Amendments of 1990.[12] As amended, the CAA requires that:

> [e]ach State shall ... adopt and submit ... within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary [or secondary] ambient air quality standard (or any revision thereof) under section 7409 for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary [or secondary] standard in each air quality control region (or portion thereof) within such State.

42 U.S.C.A. § 7410(a)(1) (Supp.1993). Each State Implementation Plan ("SIP") must include "enforceable emissions limitations and other control measures, means, or techniques ... as well as schedules and timetables for compliance." 42 U.S.C.A. § 7410(a)(2)(A) (Supp.1993). The CAA amendments further provide in part that "[n]o department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan." 42 U.S.C.A. § 7506(c)(1) (Supp.1993).

Under the CAA amendments, Rhode Island is not required to submit its revised SIP until November of 1993. Therefore, during the current period, "conformity of such plans, programs, and projects will be demonstrated if—

> (A) the transportation plans and programs—
>
> \*    \*    \*    \*    \*    \*

> (iii) with respect to ozone and carbon monoxide nonattainment areas, contribute to annual emissions reductions consistent with sections 7511a(b)(1) and 7512a(a)(7) of this title."

42 U.S.C.A. § 7506(c)(3)(A)(iii) (Supp.1993). The "transportation plans and programs" mentioned in this section include Transportation Improvement Programs ("TIPs") and long-range Ground Transportation Plans ("Plans"). Rhode Island's TIP, which covers from October 1, 1991 to September 30, 1997 was adopted on September 12, 1991. Rhode Island's Plan, which covers through the year 2010, is dated March 1992.

Under section 7511a(b)(1), the Plan and TIP must be consistent with the section's requirement that "the State shall submit a revision to the applicable implementation plan to provide for volatile compound emissions reductions, within six years after November 15, 1990, of at least 15 percent from baseline emissions, accounting for any growth in emissions after November 15, 1990." 42 U.S.C.A. § 7511a(b)(1) (Supp. 1993). Plaintiffs suggest that, to be consistent with § 7511a(b)(1), the TIP and Plan themselves must provide for a reduction of 15 percent from the 1990 baseline emissions plus any growth. A guidance for determining conformity of Plans and TIPs to the CAA amendments issued by EPA and the Department of Transportation on June 7, 1991, however, suggests otherwise. (Fed.Def.Exh. 162, Att. 6.) This guidance was in effect for the conformity decisions with respect to Rhode Island's TIP and Plan. The June 1991 guidance provides that "a finding during Phase 1 that the TIP contributes to reductions consistent with [§ 7511a(b)(1)] may be made if the future emissions that result from implementation of the TIP are less by any amount than the emissions that result in the same future time period from the current situation." Id. at 19. In general, courts should afford great deference to the EPA's

---

12. In addition to their arguments concerning the Jamestown Connector, plaintiffs claim that two other projects in the Route 138 corridor, the relocation of Route 138 from Route 2 to U.S. 1 and the U.R.I. Connector, violate the Clean Air Act Amendments. Both of these projects are presently the subject of a collaborative planning process under the direction of a facilitator. (Fed.Def.Exh. 1 ¶ 24.) Until that facilitation process is completed, RIDOT has agreed not to undertake any further right-of-way acquisition or construction. Id. In light of these facts, the court does not review plaintiffs' claims as to these two projects at this time.

interpretation of statutes, such as the CAA amendments, that it is charged with enforcing. *See Citizens to Save Spencer County v. EPA,* 600 F.2d 844, 888 (D.C.Cir.1979). Furthermore, EPA's interpretation makes more sense in this case. States should be free to "decide how much reduction to require from motor vehicles and how much to require from stationary sources" in achieving compliance with the 15 percent requirement of § 7511a(b)(1) through a conforming SIP. 58 Fed.Reg. 3782 (Jan. 11, 1993). Furthermore, until Rhode Island's SIP emissions inventory is submitted in November 1993, "it will not be possible to determine the baseline from which emissions must be reduced." *Id.*

Construction of the projects included in Rhode Island's TIP results in emissions levels that are less than if the projects are not built. Plaintiffs further contend that the TIP failed to show required annual emission reductions and cite a July 1992 Further Guidance on Conformity Determinations issued by FHWA. (Fed.Def.Exh. 152, Att. 8.) This Further Guidance provides that "until a [SIP] revision is developed and approved, ... (TIP) analysis must show both an annual emission reduction from the 1990 levels, and emission levels that are less for the build than no-build scenarios." *Id.* Guidance from the EPA, however, dating from both before and after the FHWA's Further Guidance, have consistently "interpret[ed] the CAA's interim requirement to mean that plans, TIPs, and projects not from a conforming plan and TIP must contribute to emission reductions by any amount." *See* (Fed.Def.Exh. 162, Att. 6.) and 58 Fed.Reg. 3782 (Jan. 11, 1993). Accordingly, Rhode Island's Plan and TIP would appear to conform the CAA amendments and plaintiffs have not shown the requisite likelihood of success on the merits.

Regardless of whether Rhode Island's TIP and Plan conform to the CAA, defendants also argue that the Jamestown Connector project was not subject to further conformity review. Pertinent regulations in place at the time the Jamestown Connector received approval provided in part:

(d) *Projects not subject to further conformity review.* After approval of a final environmental impact statement (EIS) ... a project will not be subject to further conformity review unless:

\* \* \* \* \* \*

(3) Major steps toward implementation of the project (such as the start of construction or substantial acquisition and relocation activities) have not commenced within 3 years of the date of approval of the final EIS.

23 C.F.R. § 770.9(d)(3) (1992) (withdrawn effective December 22, 1992, 57 Fed.Reg. 60,-725). Plaintiffs contend the date of approval for the Jamestown Connector FSEIS was December 18, 1987, the date on which FHWA signed the FSEIS. Defendants contend that final approval for the FSEIS was not given until May 27, 1988, when FHWA signed its Record of Decision. No matter which suggested approval date is chosen, however, major steps toward implementation of the Jamestown Connector occurred within three years.

Although construction of the Jamestown Connector did not begin until 1993, "substantial acquisition and relocation activities" occurred within three years of approval of the 1987 FSEIS. Rhode Island law provides that "upon the filing of the description, plat, and statement the title of [ ] land [acquired through condemnation proceedings] ... shall vest in the State of Rhode Island." R.I.Gen. Laws § 37–6–14 (1990). As of November 7, 1990, RIDOT had filed plats for at least 143 of the 202 parcels required for the right-of-way to construct the Jamestown Connector. (*See* Plaintiffs' Exh. 7 and State Def. App.Exh. 636–642.) Thus, even using plaintiffs' suggested approval date, RIDOT's filings amounted to substantial acquisition activities under the FHWA regulations in place at the time. Accordingly, under the regulations in place both at the time of the approval of the 1987 FSEIS and at the time major steps toward implementation of the project occurred, the Jamestown Connector was not subject to further conformity review.

Because plaintiffs have not demonstrated a likelihood of success on the merits, the application for preliminary injunction is denied with respect to their CAA claims.

V. Conclusion

The plaintiffs have not shown that they are likely to succeed on the merits of any of their claims. Accordingly, the application for a preliminary injunction enjoining further construction of the Jamestown Connector project is denied.

## APPENDIX A

### List of Abbreviations and Acronyms

| | |
|---|---|
| CAA | Clean Air Act |
| CLF | Conservation Law Foundation |
| Corps | United States Army Corps of Engineers |
| CWA | Clean Water Act |
| DEIS | Draft Environmental Impact Statement |
| DSEIS | Draft Supplemental Environmental Impact Statement |
| DOT | Department of Transportation Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | United States Environmental Protection Agency |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| FONSI | Finding of No Significant Impact |
| FSEIS | Final Supplemental Environmental Impact Statement |
| ISTEA | Intermodal Surface Transportation Efficiency Act |
| MPO | Metropolitan Planning Organization |
| NEPA | National Environmental Policy Act |
| Plan | Ground Transportation Plan |
| RIDOT | Rhode Island Department of Transportation |
| ROD | Record of Decision |
| SIP | State Implementation Plan |
| SOV | Single Occupant Vehicle |
| TIP | Transportation Improvement Program |

APPENDIX B

STUDY AREA AND PROPOSED ACTION

Wilbour Smith and Associates

FIGURE I.3-1

DOT01 0138399

APPENDIX C

STUDY AREA LOCATION

STUDY AREA        45

STUDY AREA
STATE ROUTE 138
JAMESTOWN, RHODE ISLAND

SOURCE: *Wilbur Smith and Associates*

FIGURE: 1-1

894

JAMESTOWN SEIS

LOCATION OF ALTERNATIVES

MAPS NOT TO SCALE

SOURCE: *Brian Smith and Associates*

FIGURE 2-1