June 3, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1976

CONSERVATION LAW FOUNDATION OF
NEW ENGLAND, INC., ET AL.,
Plaintiffs - Appellants,

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,
Defendants - Appellees.

ERRATA SHEET

The opinion of this court issued on May 23, 1994 is amended

as follows:

On the cover sheet, the caption should read: "Conservation

Law Foundation, et al., Plaintiffs-Appellants" instead of

"Conservation Law Foundation of New England, Inc., et al.,

Plaintiffs-Appellants."

UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

No. 93-1976

CONSERVATION LAW FOUNDATION, ET AL.,

Plaintiffs - Appellants,

v.

FEDERAL HIGHWAY ADMINISTRATION, ET AL.,

Defendants - Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Francis J. Boyle, Senior U.S. District Judge]

Before

Torruella, Cyr and Boudin,

Circuit Judges.

Stephen H. Burrington with whom Conservation Law Foundation,

Molly Cochran, Sullivan & Worcester, John Marks and J. William W.

Harsch were on brief for appellants.

Thomas F. Holt, Jr. with whom Laura Grant Schwartz, William

C. Nystrom and Kirkpatrick & Lockhart were on brief for appellees

Dante E. Boffi, Jr., in his official capacity as Director of the

Rhode Island Department of Transportation, and the Rhode Island

State Planning Council.

William B. Lazarus, Attorney, Department of Justice, with

whom Lois J. Schiffer, Acting Assistant Attorney General, Edwin

J. Gale, United States Attorney, Michael P. Ionnotti, Assistant

U.S. Attorney, Mary Elizabeth Ward, Beverly Sherman Nash, and

Jacques B. Gelin, Attorneys, Department of Justice, were on brief

for appellees Federal Highway Administration; Gordon G. Hoxie, in

his official capacity as Division Administrator for the Rhode

Island Division of the Federal Highway Administration; and Arthur

E. Williams, in his official capacity as Chief of Engineers of

-2-

the U.S. Army Corps of Engineers.

Daniel R. Barney, Lynda S. Mounts, Ata Litigation Center,

Steven S. Rosenthal, Nancy F. Goodman, and Morrison & Foerster on

brief for American Trucking Associations, Inc., amicus curiae.

May 23, 1994

-3-

TORRUELLA, Circuit Judge. Plaintiffs in this case

appeal the denial of their motion for a preliminary injunction.

The district court denied the injunction on the ground that the

plaintiffs failed to show a likelihood of success on the merits

of their underlying claims. See Narragansett Indian Tribe v.

Guilbert, 934 F.2d 4, 5 (1st Cir. 1991). We review the district

court's denial of the preliminary injunction "'under a relatively

deferential glass,'" and will disturb such a ruling only if we

find the court made a manifest mistake of law or abused its

discretion. Id. (quoting Independent Oil & Chem. Workers of

Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st

Cir. 1988)).

After reviewing the record in this case and the

arguments in the briefs, we conclude that the district court did

not abuse its discretion or make any manifest errors of law when

it found that plaintiffs had failed to establish a likelihood of

success on the merits of their claims under the National

Environmental Policy Act ("NEPA"), 42 U.S.C. 4321-4347;

Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. 1344(a);

Section 4(f) of the Department of Transportation Act ("DOTA"), 49

U.S.C. 303(c); and Section 176 of the Clean Air Act ("CAA"), 42

U.S.C. 7506(c). We therefore affirm the district court's

denial of plaintiffs' motion for a preliminary injunction.

Because the district court's opinion presents a

thorough and accurate discussion of the facts of this case, we

find it appropriate to incorporate that discussion into our

-3-

decision.

-4-

I. Introduction

This litigation stems from the
proposed construction of the Jamestown
Connector, a four-lane, divided,
controlled access highway across the
island of Jamestown, Rhode Island which
will connect the Jamestown-Verrazzano
Bridge and the Pell (Newport) Bridge.
Jamestown Island, lies in the middle of
Narragansett Bay in what is known by some
as the Route 138 corridor, a forty (40)
mile stretch of roadways running from I-
95 in Richmond, Rhode Island to I-195 in
Swansea, Massachusetts. The plaintiffs
are the Conservation Law Foundation
("CLF"), Audubon Society of Rhode Island,
Clean Water Action, Concerned Island
Residents, DOT Watch, Environmental
Council of Rhode Island, Save the Bay,
Sierra Club, South Kingstown Neighborhood
Congress, and West Side Association.
Plaintiffs filed two separate actions,
which have been consolidated, seeking to
enjoin construction of the Jamestown
Connector. The defendants are the
Federal Highway Administration ("FHWA"),
Gordon G. Hoxie in his official capacity
as Division Administrator for the Rhode
Island Division of the Federal Highway
Administration, Arthur E. Williams in his
official capacity as Chief of Engineers
of the U.S. Army Corps of Engineers ("the
Corps"), Dante E. Boffi, Jr. in his
official capacity as Director of the
Rhode Island Department of Transportation
("RIDOT"), and the State Planning
Council. In total, plaintiffs allege
violations of five federal statutes: the
National Environmental Policy Act
("NEPA"), the Intermodal Surface
Transportation Efficiency Act "(ISTEA"),
the Clean Water Act ("CWA"), the
Department of Transportation Act ("DOT"),
and the Clean Air Act ("CAA").

II. Factual Background

The history of this highway project
dates back to proposed Interstate Highway
895 ("I-895"), which received original
approval in December 1969 as part of the

-5-

Interstate and Defense Highway System.
The original proposed 12.1 mile route
spanned Narragansett Bay between Warwick
and Barrington, Rhode Island. In 1974,
FHWA approved a RIDOT proposal which
recommended a substitute route. The
proposed substitute I-895 essentially
tracked Route 138, an undivided roadway
dating from the early 1920's, from I-95
in Richmond, Rhode Island to I-195 in
either Swansea or Fall River,
Massachusetts. Route 138 is the only
road crossing Narragansett Bay south of
Providence, Rhode Island.

In November 1975, RIDOT initiated an
Environmental Impact Statement/Corridor
Location Study for designated I-895. In
April 1979, RIDOT published the I-895
Draft Environmental Impact Statement
("DEIS"). The 1979 DEIS recognized that
Route 138 "was not intended to
accommodate the types of vehicles,
prevailing operating speeds, and the
volumes of traffic" that it then carried.
Following the publication of the DEIS,
community comment was received at four
public hearings. On February 5, 1982,
the State of Rhode Island requested
withdrawal of proposed I-895 from the
Interstate Highway System. On December
30, 1982, FHWA approved Rhode Island's
withdrawal request because I-895 was not
"essential to the completion of a unified
and connected Interstate System."
(Fed.Def.Exh. 6) Much of the proposed I-
895 corridor, however, remained eligible
for federal funds for substitute
projects.

The 1979 DEIS contained a separate
section addressing the construction of a
Jamestown Bridge replacement structure.
Because of its functional obsolescence,
increases in traffic volumes,
skyrocketing maintenance costs and the
need for a completely new concrete deck,
RIDOT determined that the existing two-
lane Jamestown Bridge needed replacement.
The Surface Transportation Act of 1978
specifically allocated discretionary
funding under the Highway Bridge

-6-

Replacement Program to implement the
Jamestown Bridge replacement project. As
a result, FHWA authorized the development
of a site-specific Jamestown Bridge
Environmental Impact Statement ("JBEIS").
The JBEIS, completed in May 1989,
proposed a four-lane replacement bridge
adjacent to the existing bridge and four-
lane access roadways extending from Route
1A in North Kingstown to Helm Street on
Jamestown.

Following the decision to withdraw I-
895, RIDOT continued to examine the need
for improvements throughout the Route 138
Corridor. RIDOT's analysis culminated in
1984 with the issuance of a Final
Environmental Impact Statement ("FEIS")
for the corridor. FHWA approved the FEIS
on September 27, 1984. The 1984 FEIS
study area encompassed Washington,
Newport, and Bristol Counties in Rhode
Island, as well as Swansea,
Massachusetts. In Washington County, the
FEIS proposed a mixture of upgrades to
certain existing portions of Route 138, a
no-build option for other portions of
Route 138, and construction of new
roadways in other areas of the corridor.
On Jamestown Island, the FEIS proposed a
four-lane reconstruction along the
available right of way on Eldred Avenue
(1.1 miles) and two possible four-lane
alternatives for East Shore Road (1.1
miles). The FEIS recognized that the
Jamestown Design Study Committee
("JDSC"), which had been formed in
February of 1983, was considering the
entire connector roadway system for
Jamestown Island. Accordingly, the FEIS
contemplated draft and final supplemental
EIS documents for the project following
decisions by JDSC and RIDOT. On
Aquidneck Island, the 1984 FEIS
recognized the need for improvements but
proposed a no-build alternative and
recommended further studies. Finally,
the FEIS proposed a no-build option for
the East Shore portion of the study area
including Bristol County, Rhode Island
and Swansea, Massachusetts.

-7-

Following the 1984 FEIS, the JDSC
convened numerous public meetings on
Jamestown and collected community
reaction to the proposed cross-island
roadway. Based upon community input, the
JDSC recommended a conceptual plan to
RIDOT in June 1984 which, with certain
refinements, became known as Alternative
B. Alternative B proposed a controlled
access four-lane roadway extending from
the Jamestown-Verrazzano Bridge along
Eldred Avenue with interchanges at Helm
Street and North Road and flowing into a
new four-lane roadway located west of
East Shore Road extending to the Newport
Bridge.

Based on the JDSC's recommendations,
RIDOT completed a draft supplemental
environmental impact statement ("DSEIS")
in April 1986. The FHWA approved the
DSEIS on April 22, 1986. The DSEIS
considered six alternatives for a cross-
island roadway on Jamestown: a No-Build
Alternative, the Transportation Systems
Management ("TSM") Alternative, two
unlimited access roadways (Alternatives A
and A1), and two limited access roadways
(Alternatives B and C). The DSEIS
identified Alternative B, now known as
the "Jamestown Connector", as the
preferred alternative. RIDOT circulated
the DSEIS on May 23, 1986 and held a
public hearing at the Jamestown
Elementary School on June 26, 1986.

Following the submission of the DSEIS,
RIDOT began pursuing necessary permits
for Alternative B from the Rhode Island
Department of Environmental Management
("RIDEM"). Pursuant to provisions of the
Administrative Procedure Act and Rhode
Island's Freshwater Wetlands Act, a
wetland public hearing was held on
February 10, 1987 to resolve issues
pertaining to wetland impacts and
Alternative B. Following the hearing,
RIDOT and RIDEM signed a consent
agreement which modified Alternative B to
minimize wetlands impact. The RIDEM
Wetlands Public Hearing Officer
incorporated the conditions of the

-8-

consent agreement into the final design
and order rendered on April 30, 1987.
The order specified conditional permit
approval to alter freshwater wetlands.

RIDOT completed a final supplemental
environmental impact statement ("FSEIS")
for the Jamestown Connector in July 1987
and FHWA approved the FSEIS on
December 18, 1987. The FSEIS responded
to comments received on the 1986 DSEIS
and investigated the same six design
alternatives, with some modifications,
considered by the 1986 DSEIS. According
to the FSEIS, traffic safety and drainage
concerns rendered the No-Build
Alternative and the TSM Alternative not
viable. The unlimited access upgrade
alternatives, A and A1, failed to
separate local and through traffic,
failed to maintain highway continuity,
permitted continued development along the
alignment frontage, and allowed for high
traffic volumes, congestion and
increasing accident rates. Alternative C
affected the greatest acreage in the
Windmill Hill Historic District and
failed to attract support from Jamestown
residents because of undesirable local
access designs. Alternative B,
meanwhile, provided the greatest benefits
while minimizing adverse impacts to the
residents and surrounding environment
according to the FSEIS. As a result, the
FSEIS identified Alternative B as the
preferred alternative. On May 27, 1988,
FHWA issued a Record of Decision ("ROD")
on the FSEIS which expressly ratified the
selection of Alternative B for further
project development.

The 1987 FSEIS also found Alternative
B to be consistent with six other planned
and committed highway projects within the
Route 138 Corridor: the I-95 to Route 2
upgrade; the relocation of Route 138 from
Route 2 to U.S. 1; the reconstruction of
Route 138 from U.S. 1 to the Jamestown
Bridge; the Jamestown Bridge Replacement;
the Newport Circulator Project; and the
Route 138 upgrading along East Main Road
from Route 24 to Route 113. The

-9-

cumulative impacts of the projects
located in Washington County and
Jamestown (all projects except the
Newport Circulator and the East Main Road
upgrade) had been previously analyzed in
the corridor-wide 1979 DEIS and 1984
FEIS.

RIDOT proposed reconstruction of the
two-lane roadway from I-95 to Route 2 in
three phases. Phase one was completed in
1981 and the other two phases are in the
preliminary design stage. RIDOT
reevaluated the FEIS for the relocation
of Route 138 from Route 2 to U.S. 1 in
February 1991 and modified the original
alignment. The roadway from Route 1 to
the Jamestown Bridge, approved in the
1981 JBEIS, was constructed during 1992.
The new Jamestown-Verrazzano Bridge
replaced the Jamestown Bridge and opened
to traffic on October 19, 1992. The
Newport Circulator Project has been
replaced by a series of lesser
improvements expected to be forwarded
with a request for a Finding of No
Significant Impact ("FONSI") in Summer
1993. Finally, the FHWA approved
improvements to the four-lane East Main
Road on December 24, 1991 and selection
of a consultant to begin final design is
underway.

The 1987 FSEIS also examined impacts
to parklands and historic resources
governed by Section 4(f) of the
Department of Transportation Act ("DOT")
and Section 106 of the National Historic
Preservation Act. This evaluation
focuses on the Windmill Hill Historic
District and examined four build
alternatives, a No-Build Alternative, and
an Avoidance Alternative. Although the
No-Build Alternative would not impinge
upon historic resources, it failed to
meet the project goals and was determined
to be neither prudent nor feasible. All
four of the build alternatives adversely
effected the Windmill Hill Historic
District. The FSEIS determined that
Alternatives A and A1, both four-lane
uncontrolled access roadways with at

-10-

grade intersections, carried far less
short-term impacts on historic resources
than the preferred alternative. These
alternatives, however, failed to meet
traffic service and safety concerns and
permitted the possibility of future
development which could have a far
greater long-term impact on the historic
district. The FSEIS determined that
Alternative C, a limited access highway
on a different alignment, required the
use of more historic resources than
Alternative B without providing
offsetting traffic or safety benefits.
Finally, although an Avoidance
Alternative, designed to avoid all
protected Section 4(f) resources on
Jamestown Island, was feasible, the FSEIS
determined that it was not prudent
because of "a number of disruptive
consequences involved in this or any
alternative that avoids the Windmill Hill
Historic District." Although it found
that Alternative A1 caused the least
impact to the historic district, the
Rhode Island Historical Preservation
Commission recognized that the separation
of through and local traffic achieved
with Alternative B necessitated
considering this alternative even though
it had greater short-term Section 4(f)
impacts. The 1987 FSEIS ROD concluded
that there was no prudent or feasible
alternative to the use of land from the
Windmill Hill Historic District and
Alternative B included all possible
planning to minimize harm resulting from
such use.

On June 8, 1988, FHWA authorized the
acquisition of parcels to establish a
right-of-way along Eldred Avenue from
Seaside Drive to North Road. By
November 7, 1990, RIDOT had acquired at
least 143 of the 202 parcels necessary to
build the Jamestown Connector.

In October, 1986 RIDOT submitted to
the Corps the first of a series of
applications for a permit for the filling
of wetlands in connection with the
Jamestown Connector. (Plaintiffs' Exh.

-11-

22 and 23.) Although the Corps issued a
public notice regarding its permit review
for the Jamestown Connector on
November 29, 1990, no public hearing was
held in connection with the permit
application. On May 22, 1992, the Corps
completed an Environmental Assessment
("EA") and statement of findings for the
purposes of issuing a Section 404 permit
to fill wetlands. The EA "considered all
factors relevant to th[e] proposal
including cumulative effects." The
environmental assessment minimized
wetlands impacts by replacing the Helm
Street overpass with a frontage road to
address local access concerns. Based on
the evaluation of environmental effects
discussed in the 1987 FSEIS, the Corps
determined that the "decision on [the
Section 404] application [was] not a
major federal action significantly
affecting the quality of the human
environment" and therefore required no
separate environmental impact statement.
The Corps concluded that Alternative B
without the Helm Street overpass was the
least environmentally damaging
practicable alternative. As a result, on
May 21, 1992, the Corps issued a final
Section 404 permit authorizing RIDOT to
fill approximately 4.6 acres of wetlands
to construct the Jamestown Connector.

Throughout and following the Corps
permit approval process, the JDSC
continued to hold periodic meetings to
evaluate additional proposed refinements
to the Jamestown Connector design. In a
JDSC meeting held on May 7, 1992, Thomas
Todd, an architect and Jamestown
resident, presented an alternative design
featuring an at-grade, signalized
intersection at the crossing of Eldred
Avenue and North Road. Mr. Todd's
conceptual layout incuded two travel
lanes in each direction and separate left
and right turn lanes along Eldred Avenue.
Minutes of the meeting reflect that Mr.
Todd also had contacted the Jamestown
Police and had been informed that there
had been 213 accidents (78 involving
injury) on Route 138 in Jamestown over

-12-

the previous five year period. Records
at the Newport Bridge Toll Plaza
indicated that approximately 31 million
trips had been made over that same time
period. At the same meeting, the JDSC
formed an architectural review committee,
with Mr. Todd as a member. Over the next
six months, RIDOT incorporated certain
profile and architectural adjustments
suggested by the architectural review
committee into the Jamestown Connector
design.

FHWA conditionally approved the
receipt of bids for the Jamestown
Connector on July 31, 1992. Plaintiffs
commenced this action on October 8, 1992.
RIDOT opened bids for the Jamestown
Connector on December 11, 1992. On April
21, 1993, RIDOT issued a conditional
notice to proceed with construction
activity to its contractor, Tilcon
Gammino. After final notice to proceed
was given, construction began on May 13,
1993. On May 21, 1993, plaintiffs moved
for a temporary restraining order ("TRO")
to enjoin further construction. On May
25, 1993, this court granted plaintiffs'
TRO application which restrained further
construction activity within the frontage
road area along Eldred Avenue. The court
vacated the TRO on June 8, 1993.
Defendants have moved to dismiss
plaintiffs' Clean Air Act claim for lack
of jurisdiction and failure to state a
claim upon which relief can be granted.
Plaintiffs, in turn, have moved for
summary judgment on their Clean Air Act
and Intermodal Surface Transportation
Efficiency Act claims. Because these
motions raise substantially the same
issues as plaintiffs' application for
preliminary injunction, the court defers
ruling on them and considers all claims
under the preliminary injunction
standard.

Conservation Law Found. v. Federal Highway Admin., 827 F. Supp.

871, 872-77 (D.R.I. 1993) (footnotes omitted).

I. DISCUSSION

-13-

Plaintiffs challenge the district court's findings

under NEPA, 404 of CWA, 4(f) of DOTA, and the CAA.

Conservation Law Found., 827 F. Supp. at 877-91. We bear in mind

that the district court reviewed the actions of several

administrative agencies throughout much of its opinion. The

actions of such agencies shall not be overturned unless

"arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. 706(2)(A). In particular,

the administrative actions taken in this case under NEPA, 404

of CWA, 4(f) of DOTA and 176 of the CAA are subject to a

highly deferential abuse of discretion standard of review. Marsh

v. Oregon Natural Resources Council, 490 U.S. 360, 377-78 & n.23

(1989) (NEPA); Sierra Club v. Marsh, 976 F.2d 763, 769 (1st Cir.

1992) (NEPA); Norfolk v. United States Army Corps of Eng'rs, 968

F.2d 1438, 1445-46 (1st Cir. 1992) ( 404 of the CWA);

Communities, Inc. v. Busey, 956 F.2d 619, 623-24 (6th Cir.),

cert. denied, 113 S. Ct. 408 (1992) ( 4(f) of the DOTA) (citing

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,

416 (1971)); Sierra Club v. Larson, 2 F.3d 462, 466-69 (1st Cir.

1993) (substantial deference given to EPA's interpretation of the

CAA); Puerto Rican Cement Co. v. United States EPA, 889 F.2d 292,

296-98 (1st Cir. 1989) (EPA's construction of the CAA given

"controlling weight" unless it is "plainly erroneous"). For the

following reasons, we uphold the district court's findings in

this case.

A. NEPA CLAIMS

-14-

1. Logical Termini

The district court found that none of the defendants

violated its respective obligations under NEPA to prepare proper

Environmental Impact Statements ("EISs") for the Jamestown

Connector highway project. In particular, the court rejected

plaintiffs' argument that the defendants unlawfully segmented the

geographic area of analysis in the 1987 Jamestown Connector EIS

("Jamestown FSEIS") and that defendants failed to consider the

cumulative impacts of highway projects all along the Route 138

Corridor.

Federal Highway Administration ("FHWA") regulations

provide that an EIS is of proper geographic scope if the project

it analyzes connects "logical termini," has "independent utility"

and does not restrict "consideration of alternatives." 23 C.F.R.

771.111(f). The district court found that the Jamestown

Connector project satisfied all three criteria and, as a result,

the 1987 Jamestown FSEIS was of the appropriate scope. The

plaintiffs take issue only with the court's determination of the

first prong (the so-called "logical termini" prong).

"Termini" include crossroads, population centers, major

traffic generators, or similar highway control elements. 37 Fed.

Reg. 21,810. The district court found that the two bridges on

each side of the Jamestown Connector (entering and exiting

Jamestown island) are logical enough termini to uphold the

agencies' determination that the connector was a proper

geographic area for environmental analysis. In particular, the

-15-

court accepted defendants' argument that the bridges are traffic

generators or traffic control devices.

Plaintiffs contend that the bridges do not qualify as

"crossroads" or "traffic generators," but instead are merely

indistinguishable strips of the highway that happen to pass over

water. According to the plaintiffs, because most traffic merely

passes over the bridges and through the island on its way to and

from cities in Connecticut and Massachusetts, and to and from

various highway interchanges that are located several miles away

from the bridges, the bridges themselves neither control nor

generate any traffic but merely carry it. Thus, the bridges are

allegedly not a "beginning or end" such that they could

reasonably be considered "termini."

Plaintiffs present a strong argument, but, given that

we are reviewing this case for an abuse of discretion, we cannot

find that the district court erred in upholding the agencies'

determination of termini. See Swain v. Brinegar, 542 F.2d 364,

369 (7th Cir. 1976) ("The task of the court is not to decide

where to draw the line, but to review the matter to ascertain

whether the agency has made a reasonable choice."). The bridges

may not "control" or "generate" traffic in the strict sense of

those words, but they do represent the only way that cars can get

onto and off of the island. Thus, traffic passing through

southern Rhode Island is controlled by the existence and

condition of those bridges. Although the FHWA is not free to

consider every bridge or culvert in a highway system to be a

-16-

suitable end point for purposes of conducting EIS analysis, two

bridges over Narragansett Bay, a considerably large body of

water, can reasonably constitute a major "highway control

element." 37 Fed. Reg. 21,810. Ultimately, when viewed through

the lens of basic common sense, two bridges on either side of an

island appear to be perfectly logical termini to us.

None of the authorities cited by the plaintiffs

indicates that "logical termini" must be located at interchanges

or major metropolitan areas. We do not believe that those

decisions which found indistinguishable strips of highway to be

improper termini for EIS purposes apply to the present case. See

Swain 542 F.2d at 369-70; Indian Lookout Alliance v. Volpe, 484

F.2d 11, 19-20 (8th Cir. 1973); Patterson v. Exon, 415 F. Supp.

1276, 1283 (D. Neb. 1976). We also do not find any authority for

plaintiffs' assertion that the district court erred as a matter

of law by considering the geographic situation of Jamestown

Island in its determination that the bridges are logical termini.

Indian Lookout Alliance, 484 F.2d at 18-19, for example, says

nothing about the propriety or impropriety of considering special

geographic features in making logical termini analysis. Rather,

the case simply states that courts should look to the nature and

purpose of the project in determining which termini are logical.

Id. In this case, one of the purposes of the Jamestown Connector

is to facilitate traffic passing from one side of the island to

the other. From this perspective, the bridges are logical

endpoints.

-17-

The district court also considered the two other

elements in 23 C.F.R. 771.111(f) ("independent utility" and

"reasonable alternatives") when it found that the Jamestown FSEIS

was of the proper scope. The court found that these two factors

carry more weight in this case than the "logical termini" prong.

Plaintiffs argue that this finding is error because courts can

only accord "logical termini" less importance where the highway

project is in a major metropolitan area. The relevant cases

concerning the reduced weight afforded to the "logical termini"

prong do involve highway projects in metropolitan areas. See,

e.g., Coalition on Sensible Transp. Inc., v. Dole, 826 F.2d 60,

69 (D.C. Cir. 1987); Piedmont Heights Civic Club, Inc. v.

Moreland, 637 F.2d 430, 440 (5th Cir. 1981). The courts in those

cases, however, did not reduce the weight afforded to the termini

prong simply because the area in question was urban as opposed to

rural. Rather, the courts reduced the importance of the termini

factor in those cases because it was difficult to determine where

projects began and ended in convoluted urban highway systems.

Coalition on Sensible Transp., 826 F.2d at 69; Piedmont Heights,

637 F.2d at 440. Therefore, the district court did not err in

stating that, as a matter of law, the "independent utility" and

"reasonable alternative" prongs are more important "where logical

termini are not so easily determined." Conservation Law Found.,

827 F. Supp. at 879. Although the Jamestown Connector does not

involve the usual spaghetti of highway interchanges often found

in urban centers, it does involve sufficient special

-18-

circumstances -- the traversing of an island in the middle of

Narragansett Bay -- to warrant a finding that "logical termini

are not so easily determined."

2. Cumulative Impact

The plaintiffs next contend that the district court

erred in finding that the Jamestown FSEIS properly considered the

cumulative effects on the environment of all projects along the

entire Route 138 corridor as required by NEPA and the regulations

promulgated by the Council on Environmental Quality ("CEQ"). 40

C.F.R. 1508.7 & 1508.25(a). The district court stated that

the Jamestown FSEIS "concluded that the Jamestown Connector was

consistent with six other planned and committed projects in the

Route 138 Corridor." Recognizing that this was not, in itself, a

complete cumulative analysis, the court then added that the

Jamestown FSEIS also referenced the FHWA's 1984 Route 138 EIS

("1984 FEIS") and the original I-895 draft EIS ("1979 DEIS")

which did conduct a sufficient cumulative impact analysis.1 The

1 Plaintiffs take issue with the district court's use of a
quote, Conservation Law Found., 827 F. Supp. at 880, from

Fritiofson v. Alexander, 772 F.2d 1225 (5th Cir. 1985), stating

that a "full-blown environmental analysis of the impacts of other
actions" is not required. Although the plaintiffs are correct
that this quote refers to a preliminary Environmental Assessment
and not to a more in-depth EIS, the quote does interpret the very
same regulations applied in this case. In any event, the quote
is not a crucial part of the district court opinion because the
court goes on to explain why the EISs do in fact contain a full
cumulative effects analysis. Similarly, the following sentence
on page 880, referring to a satisfaction of "statutory minima"
under Piedmont Heights, 637 F.2d at 441, although pertaining to

the NEPA statute in general instead of the specific CEQ
regulations at issue here, is still applicable to this case
because it addresses the basic question of what information can
be used by agencies to analyze cumulative effects of various

-19-

district court noted that the 1979 DEIS considered the effects of

the entire Route 138 corridor and that the 1984 FEIS analyzed

projects in Washington County and Jamestown, including the

"general location and mode choice for what would become the

Jamestown Connector." Conservation Law Found., 827 F. Supp. at

881.

Plaintiffs first of all contest the court's conclusion

that the 1984 FEIS and the 1979 DEIS conducted the necessary

cumulative analysis. They do not take issue with the substance

of the analysis in these reports or with the thoroughness of the

environmental review conducted by the defendants. Instead,

plaintiffs challenge the geographic scope of the area considered

in those reports, arguing that because parts of the Route 138

corridor were left out of the various EISs, their analyses cannot

be completely cumulative. They claim that the 1984 FEIS did not

analyze proposed actions for the Route 138 corridor east of

Washington County (which is basically the Newport Rhode Island

area where the highway continues east of Jamestown Island after

crossing the eastern bridge off the island). While the 1979 DEIS

did analyze this area, it did not consider the exact same highway

routes and projects that are presently contemplated for the area

(i.e., the original projects for that area have since been

discarded). Consequently, plaintiffs point out that neither EIS

projects. We think it is reasonable, and plaintiffs present no
caselaw to the contrary, for agencies to consider prior studies,
draft or otherwise, in their EISs and to include them by
reference.

-20-

analyzed two of the six projects listed within the Jamestown

FSEIS as part of the Route 138 corridor (the Newport Circulator

and East Main Road upgrade).2

For us, the bottom line is that the relevant agencies

conducted an analysis of the environmental impact of highway

construction projects along Route 138. The 1979 and 1984 EISs

contain in-depth discussions (300 pages worth in the 1979 DEIS

and 200 pages in the 1984 FEIS) covering a wide range of

environmental concerns surrounding highway construction in the

area of Route 138. For its part, the Jamestown FSEIS explicitly

referenced the two prior EISs and placed the Jamestown connector

in the context of the entire Route 138 corridor project. The

1979 and 1984 EISs may not have covered precisely the same

geographical areas or projects that are now being built or

proposed in conjunction with the Jamestown Connector, but they

did sufficiently consider the incremental impact of individual

2 Plaintiffs also claim that the 1984 FEIS "deferred analysis of
the Jamestown Connector," by noting several times that the
process for deciding on the construction design and route for the
Jamestown Connector was ongoing and that no decision had been
made. Therefore, plaintiffs argue, the 1984 FEIS did not
properly consider the cumulative impact of all projects taken
together in its environmental analysis. This argument strikes us
as a red herring. The 1984 FEIS clearly contemplated some kind
of highway construction between the two bridges on Jamestown
Island and it explicitly discussed the fact that a more in-depth
environmental study of the island would be done in a supplemental
EIS. A full description of the environment on Jamestown island
was included in the 1984 FEIS. The Jamestown FSEIS was
subsequently written as a supplement to the 1984 FEIS and both
EISs contemplated that the two would be read together. The
district court found this to be sufficient to satisfy the
cumulative impact analysis requirement and we see no abuse of
discretion in this ruling.

-21-

sections of Route 138 construction "when added to other past,

present and reasonably foreseeable future actions." 40 C.F.R.

1508.7. We therefore do not believe the district court abused

its discretion in rejecting the plaintiffs' contention that the

aforementioned discrepancies in the EISs violated NEPA.

Plaintiffs nevertheless maintain that even if the

combined analyses contained in all the EISs constitute proper

cumulative impact review, the process of referencing them in the

Jamestown FSEIS does not comport with the cumulative impact

requirements in the CEQ regulations. According to the

plaintiffs, a particular EIS cannot incorporate the findings of

other EISs unless it is part of a proper "tiering" process as

provided for in 23 C.F.R. 771.111(g). Under 777.111(g):

For major transportation actions, the
tiering of EISs as discussed in the CEQ
regulation (40 C.F.R. 1502.20) may be
appropriate. The first tier EIS would
focus on broad issues . . . . The second
tier would address site-specific details
. . . .

The district court found the "tiering" of the Jamestown FSEIS on

top of the 1984 FEIS and 1979 DEIS to be proper in this case.

Plaintiffs claim this finding is erroneous because: (1)

the 1979 DEIS was just a draft having no legal effect; (2) the

1984 FEIS did not qualify as a programmatic evaluation upon which

smaller projects could be tiered; and (3) the Route 138 Corridor

is not a sufficiently large, wide-ranging federal project for

which tiering is appropriate.

Although the plaintiffs are correct that the 1979 DEIS

-22-

has no legal effect and cannot, by itself, serve as the first

tier in the EIS process, nothing that the plaintiffs point to

precludes a final EIS from referring to the reports and data

contained in a draft EIS to analyze cumulative impacts of

governmental actions. Thus, the information in the 1979 DEIS can

be considered a part of the cumulative impact analysis for Route

138.

The plaintiffs further argue that the 1984 FEIS was not

sufficiently comprehensive to constitute a programmatic first

tier that can support the second tier in the Jamestown FSEIS. To

support this contention, plaintiffs basically restate their

earlier argument that the 1984 FEIS failed to analyze all the

proposed projects along the entire Route 138 corridor. To

briefly restate our rejection of this argument, the 1984 FEIS not

only addressed the Route 138 corridor in a comprehensive fashion,

it explicitly contemplated that a supplemental EIS, the Jamestown

FSEIS, would be prepared in conjunction with the larger EIS. We

see no abuse of discretion in finding this to be a proper

application of the tiering regulations. Cases relied on by the

plaintiff to support its contention that the 1984 FEIS is

incomplete, Kleppe v. Sierra Club, 427 U.S. 390, 410 (1976);

National Wildlife Fed. v. Appalachian Reg. Comm'n, 677 F.2d 883,

888 (D.C. Cir. 1981), discuss when a single, programmatic EIS is

required, but they do not dictate the precise manner and content

of those programmatic EISs. In this case, it is reasonable to

conclude that the 1984 EIS considered together the combined

-23-

consequences of proposed actions along Route 138. See

Appalachian Reg. Comm'n, 677 F.2d at 888.

Finally, plaintiffs claim that the Route 138 Corridor

cannot be tiered because it does not qualify as a "major

transportation action." Because plaintiffs point to no case

authority for imposing a "major transportation action"

requirement in the tiering context, we find this assertion to be

unfounded. Plaintiffs cite cases involving "wide ranging federal

projects" for which broad "programmatic" EISs have been prepared.

See Kleppe v. Sierra Club, 427 U.S. 390 (1976) (development of a

national coal leasing program); Tenakee Springs v. Block, 778

F.2d 1402 (9th Cir. 1985) (land use plans for the Tongass

National Forest); National Wildlife Fed. v. Appalachian Reg.

Comm'n, 677 F.2d 883 (D.C. Cir. 1981) (the 13-state Appalachian

Highway System). None of these cases say anything about the

requirements for tiering, nor do they say anything to indicate

that a highway project, like Route 138, cannot qualify as a

"major transportation action" or even a "wide ranging federal

project." Consequently, plaintiffs provide no basis for us to

find a manifest error of law with respect to the district court's

tiering ruling.

Even if NEPA did require that a first tier EIS must

cover a "major transportation action," Route 138 appears to

qualify. Plaintiffs describe the Route 138 project as merely a

"40-mile state highway that is being upgraded with the help of

federal funds." Even if this characterization is accurate, the

-24-

district court did not abuse its discretion in finding forty

miles of highway crossing Narragansett Bay and passing through

several different islands to be a "major transportation action."

3. Actions of the Army Corps of Engineers

Under 404 of the CWA, the Army Corps of Engineers

(the "Corps") must prepare an EIS in compliance with NEPA if

there is a "substantial possibility" that the proposed actions

(in this case, the granting of a permit to fill wetlands) could

"significantly affect" the environment. For the Jamestown

Connector, the Corps prepared a preliminary Environmental

Assessment ("EA") and found no significant impact warranting a

full EIS. While the record does contain evidence that the

project will detrimentally affect some wetlands, this evidence

does not overwhelmingly contradict the Corps' conclusion that the

project will not "significantly affect" the environment. The

district court upheld the Corps' determina- tion and we find no

abuse of discretion on the part of the court or the Corps.

The district court also found that the Corps did not

improperly segment their analysis in the EA or fail to consider

cumulative effects. Plaintiffs claim error but the district

court responded fully to their objections. Conservation Law

Found., 827 F. Supp. at 881. We have nothing to add.3

3 The plaintiffs cite Fritiofson v. Alexander, 772 F.2d at 1244,

for the proposition that "conclusory statements" by the Corps
that it has considered cumulative impacts are insufficient to
show compliance with the cumulative impact requirements. We do
not read this case as standing for such a proposition or in any

-25-

B. CLEAN WATER ACT & DEPT. OF TRANSPORTATION ACT CLAIMS

Under 404 of the Clean Water Act, the Corps cannot

issue a permit to fill wetlands if there exists a "practicable

alternative"4 to the proposed action that would have less

adverse impact. Likewise, the FHWA may not approve a

transportation project under 4(f) of the Department of

Transportation Act which encroaches on a National Historic Site

unless no "prudent and feasible" alternative exists.

Plaintiffs claim that the district court erred in

crediting the determination of the Corps and the FHWA that there

were no practicable alternative designs to the Jamestown

Connector project. Specifically, plaintiffs argue that the

agencies failed to consider the so-called "Todd design" which is

identical to the design actually chosen (the FHWA and the Corps

chose "Alternative B") except that a stoplight and an at-grade

intersection would replace a proposed overpass at one of the

major intersections on the island.

Although the defendants did not explicitly consider the

Todd design itself, the district court found that the Corps and

the FHWA did consider the main feature of the Todd design -- the

way casting serious doubt on the validity of the district court's
holding.

4 40 C.F.R. 230.10(a)(2) provides that:

An alternative is practicable if it is
available and capable of being done,
after taking into consideration cost,
existing technology, and logistics in
light of overall project purposes.

-26-

at-grade intersection in place of the overpass -- when they

evaluated two other alternatives (Alternatives A and A1).

Plaintiffs object to this because Alternatives A and A1 involve

an unlimited access road and other features not present in the

Todd design. Therefore, plaintiffs contend, the conclusion by

the defendant agencies that Alternatives A and A1 are not

practicable because they involve significant traffic congestion

and safety hazards does not necessarily apply to an alternative

that removes all the traffic hazards with the exception of one

stoplight at a major intersection.

This is a valid objection, but plaintiffs' contention

does not justify a finding of an abuse of discretion or manifest

error of law. Technical discrepancies may have existed between

alternatives actually considered and an alternative which, if

considered, may have been found to be more practicable. The two

alternatives considered, however, were somewhat similar in that

they both contained an element of major concern to the Corps --

an at-grade intersection which could lead to traffic congestion

and safety problems. This similarity is sufficient to render the

Corps' substantive analysis acceptable.

Plaintiffs also argue that because two other agencies,

the Environmental Protection Agency ("EPA") and the U.S. Fish and

Wildlife Service ("FWS"), criticized the FHWA's conclusions in

the 1987 FSEIS, the Corps could not "blindly rely" on the FHWA's

conclusion that Alternative B was the least environmentally

damaging practicable alternative. As the district court points

-27-

out, however, the Corps did not "blindly rely" on the 1987 FSEIS.

Rather, the Corps supplemented the FHWA's evaluation with its own

administrative record, studies, and responses to public comment.

The district court's finding is not an abuse of discretion.

Finally, 4(f) of the DOT requires that the FHWA must

undertake all possible planning to minimize harm to historical

sites. Plaintiffs argue that the Todd design alternative

constitutes an example of required planning which would minimize

such harm. Under 4(f), agency determinations that a particular

plan minimizes harm to historical sites deserve even greater

deference than agency determinations concerning practicable

alternatives. Coalition on Sensible Transp. Inc. v. Dole, 642

F. Supp. 573, 599 (D.D.C. 1986); see also Druid Hills Civic

Ass'n. v. Federal Highway Admin., 772 F.2d 700, 716 (11th Cir.

1985). With this in mind, our review of the record convinces us

that the district court's discussion of the "planning to minimize

harm" issue, Conservation Law Found., 827 F. Supp. at 883-84, is

beyond reproach on appellate review.

-28-

C. CLEAN AIR ACT CLAIMS

1. Jurisdiction

We address, first of all, the defendants' argument that

the federal court has no jurisdiction over plaintiffs' Clean Air

Act ("CAA") claims -- an issue not addressed by the district

court but one that we nevertheless may notice on appeal. Sierra

Club v. Larson, 2 F.3d 462, 465-66 & n.3 (1st Cir. 1993); Martel

v. Stafford, 992 F.2d 1244, 1245 (1st Cir. 1993). The defendants

claim that the language of the citizen suit provision of the

Clean Air Act, 42 U.S.C. 7604(a)(1), which authorizes suits to

enforce violations of an "emission standard or limitation,"

limits such suits to cases involving standards and limitations

set in a state implementation plan or standards set by the EPA.

Because the present suit does not involve the enforcement of

standards set out in a state or EPA plan, defendants argue that

the district court had no jurisdiction to consider the

plaintiffs' claims in the first place. We disagree.

Under CAA's citizen suit provision, any person may

commence a civil action to enforce violations of an "emission

standard or limitation under this chapter." 42 U.S.C. 7604

(a)(1). The term "emission standard or limitation" is defined by

42 U.S.C. 7604(f) as a "standard of performance . . . which is

in effect under this chapter . . . or under an applicable

implementation plan."5 (emphasis added). According to its plain

5 Defendants' use of the definition for "emissions standard or
limitation" provided in 42 U.S.C. 7602(k) (a requirement
"established by the State or Administrator") is improper because

-29-

language, this section includes "standards of performance" set

out in the Act itself. The specific statutory provisions

enumerated in 7604(f)(3) are not the only statutory provisions

that can be enforced under the citizen suit provision. Rather,

as long as the claimed violation involves a "standard of

performance" "under" the CAA, the court has jurisdiction pursuant

to 7604(f)(1), even though the standard is not imposed by the

statutory sections enumerated in 7604(f)(3).

In this case, plaintiffs are challenging the

defendants' violation of the CAA conformity requirements, 42

U.S.C. 7506 (c)(1) & (c)(3), which mandate that defendants

demonstrate that their transportation projects "would contribute

to annual emissions reductions consistent with" the levels set

out in 7511a(b)(1) and 7512a(a)(7). These conformity

requirements plainly constitute an emissions "standard of

performance" as that term is defined in 42 U.S.C. 7602(l) ("a

requirement of continuous emission reduction, including any

requirement relating to the operation or maintenance of a source

to assure continuous emission reduction"). Therefore, because

the citizen suit provision allows for suits to enforce "standards

of performance," 42 U.S.C. 7604(f)(1), this court has

jurisdiction over plaintiffs' CAA claims. See Delaney v. EPA,

898 F.2d 687, 693 (9th Cir.), cert. denied, 498 U.S. 998 (1990)

(enforcing 42 U.S.C. 7506(c) and EPA conformity guidelines in

7604(f) defines this term for all of 7604, trumping the
definition in 7602(k).

-30-

citizen suit).

We recognize that there are a number of cases holding

that the citizen suit provision, 42 U.S.C. 7604, only applies

to suits against individual polluters or government actors that

fail to comply with the specific requirements of a state or EPA

implementation plan, and that the provision does not encompass

statutory directives requiring the creation of such

implementation plans in the first place. Wilder v. Thomas, 854

F.2d 605, 613-15 (2d Cir. 1988), cert. denied, 489 U.S. 1053

(1989); League to Save Lake Tahoe, Inc. v. Trounday, 598 F.2d

1164, 1173 (9th Cir.), cert. denied, 444 U.S. 943 (1979);

Citizens Ass'n of Georgetown Committee of 100 v. Washington, 535

F.2d 1318, 1322 (D.C. Cir. 1976); Natural Resources Defense

Council, Inc. v. Train, 510 F.2d 692, 700 (D.C. Cir. 1974);

Council of Commuter Orgs. v. Metro. Transp. Auth., 683 F.2d 663,

670-71 (2d Cir. 1982). We do not believe, however, that any of

these cases have satisfactorily explained why the plain language

of 7604(f)(1) would not apply to suits like the one before us

in this case. Instead, these cases seem primarily concerned with

declining to allow plaintiffs to use 7604 as a vehicle to force

government agencies or instrumentalities to comply with their

general obligations under the Clean Air Act. See, e.g., League

to Save Tahoe, 598 F.2d at 1168-70, 1173; see also Coalition

Against Columbus Ctr. v. New York, 967 F.2d 764, 769-71 (2d Cir.

1992) (distinguishing between general air quality standards,

which are not enforceable under 7604, and specific emissions

-31-

controls which are enforceable). Thus, these cases restrict the

use of 7604 to violations of "objective evidentiary standards"

and avoid suits requiring a "reanalysis of technological or other

considerations at the enforcement stage." E.g., Wilder, 854 F.2d

at 614.

The present case is distinguishable in that plaintiffs

substantive claims involve statutory provisions that are fairly

specific and objective. See 42 U.S.C. 7506(c)(3)(A)(iii)

(requiring transportation plans -- which involve exclusively

pollution from automobile emissions -- to be consistent with

7511 a(b)(1) which requires states to formulate an

implementation plan that reduces certain pollutants by 15% from a

1990 baseline level). The provision is more similar to a

specific emission control standard applicable to a specific

source, than a general air quality standard which may be

accomplished in any number of ways depending on the

"technological considerations" of the state or agency developing

the implementation plan designed to reach the proscribed level of

air quality. Thus, even under the aforementioned caselaw, the

federal court has jurisdiction over this case.6

2. The Merits

Under 42 U.S.C. 7506(c)(1), an instrumentality of the

6 Our decision on the jurisdictional issue is a close one. The
preliminary evaluation set out above provides ample basis for
proceeding to the merits. However, because the outcome of this
case does not depend upon our jurisdictional ruling, this Court
remains free to revisit the issue in a future case where it may
be decisive.

-32-

federal government may not authorize, fund or support any

activity that does not "conform" to an approved State

Implementation Plan ("SIP"). During the relevant period in this

case (i.e., an "interim period" when no conforming SIP yet

exists), conformity for "transportation plans and programs" in

Rhode Island was demonstrated by showing that the plan and

program "contribute[d] to annual emissions reductions consistent

with 7511a(b)(1) and 7512a(a)(7) of this title." 42 U.S.C.

7506(c)(3)(A)(iii). In this case, the relevant "plan and

program" are Rhode Island's Transportation Improvement Program of

1991 ("TIP") and its Transportation Plan of 1992 ("Plan"). The

challenged governmental actions include the FHWA's authorization

of construction on the Jamestown Connector in July of 1992 and

the Corps' issuance of a permit to fill wetlands in May of 1992.

The defendants also adopted and approved the TIP and the Plan,

actions which the plaintiffs also challenge.

The district court found: (1) that Rhode Island's TIP

and Plan conformed with the requirements of the CAA because they

contributed to annual emissions reductions consistent with

7511a(b)(1); and (2) that, regardless, the Jamestown Connector

project was not subject to further conformity review pursuant to

regulations in effect at the time of approval. 23 C.F.R. 770.9

(d)(3) (w/drawn Dec. 22, 1992, 57 Fed. Reg. 60,725).

For purposes of the present litigation, which involves

construction on the Jamestown Connector, we need not consider the

conformity of Rhode Island's TIP and Plan to the extent this

-33-

issue does not effect the status of the Jamestown Connector

project itself. Because the district court's second finding is

dispositive in this case, we do not reach the issues raised in

the court's first finding.

Plaintiffs claim that the regulation found by the

district court to insulate the Jamestown Connector from further

conformity review, 23 C.F.R. 770.9(d)(3), does nothing to stop

the ban on federal support of nonconforming projects provided in

7506(c) as part of the 1990 CAA Amendments. (Again, the

challenged actions include the FHWA's authorization of

construction and the Corps' issuance of a permit to fill wetlands

in 1992). According to the plaintiffs, the 1990 CAA Amendments

either trump the effect of the regulation or simply provide new,

independent conformity requirements that must be met before

federal action can be taken on any project, regardless of that

project's own conformity status. In other words, the Jamestown

Connector may itself conform to the CAA, but the TIP and Plan do

not, so the government is barred from taking any actions in the

entire state, including actions for the Jamestown Connector.

Specifically, plaintiffs read 7506(c)(3)(B)7 to

7 42 U.S.C. 7506(c)(3)(B) provides, in relevant part, that
conformity of transportation projects will be demonstrated if
they:

(i) come from a conforming transportation
plan and program as defined in
subparagraph (A) or for 12 months after
November 15, 1990, from a transportation
program found to conform within 3 years
prior to such date of enactment.

-34-

mandate that no transportation project may receive federal

funding or support unless the project comes from a conforming

Plan and TIP as defined in 7506(c)(3)(A) or, until November of

1991, from a plan or program found to conform within 3 years

prior to November 15, 1990. The issue before us is whether

7506(c)(3) applies to all projects regardless of their status, or

just to projects that have yet to receive a conformity

determination as of November, 1990.

Without delving into statutory minutiae -- and, as a

consequence, declining the parties' invitation to engage the

battle of dueling legislative histories -- we believe that it is

certainly reasonable for the district court to (implicitly)

interpret the grace period provision in 7506(c)(3)(B)(i) as

applying only prospectively and not to past projects like the

Jamestown Connector. First of all, 7506(c)(3)(B) does not say

that no project can receive federal support unless it comes from

a conforming transportation plan. Instead, the grace period

sentence relied on by the plaintiffs, 7506(c)(3)(B)(i), is part

of a provision explaining the manner in which the "conformity" of

plans, TIPs and projects will be demonstrated for purposes of the

restriction in 7506(c)(1). Plans whose conformity has already

been demonstrated do not appear to fall under the auspices of

this provision. The grace period in 7506(c)(3)(B)(i) talks about

projects that "come from . . . a transportation program found to

conform within 3 years prior to" November 1991. It says nothing

about the project itself being found to conform during the prior

-35-

3 years. Consequently, the provision seems specifically aimed at

projects whose conformity had yet to be demonstrated by the time

the 1990 Amendments took effect.8 The Jamestown Connector was

found to conform in 1988 at the latest (by means of the approval

of the Jamestown FSEIS) and we see no indication in 7506(c)(3)

that Congress intended to abrogate this determination.

Furthermore, the language of 7506(c)(3) -- "Until

such time as the implementation plan revision . . . is approved,

conformity of such plans, programs and projects will be

demonstrated if . . ." -- sounds like it is referring to the

"interim period," that is, the time between the enactment of the

Amendments and the adoption of the new SIPs. Thus, a prospective

application of the provision seems particularly appropriate and,

conversely, a retroactive application particularly inappropriate.

This interpretation of 7506(c)(3) has apparently been adopted

by the EPA and the Department of Transportation. See June 7,

Environmental Protection Agency and Dept. of Transportation

Guidance for Determining Conformity of Transportation Plans,

Programs and Projects With Clean Air Act Implementation Plans

During Phase I of the Interim Period, June 7, 1991 at 22-23, 24-

8 For this reason, the plaintiffs' argument that the defendants'
interpretation of 7506(c)(3)(B)(i) would make that provision
superfluous is specious. Presumably, there existed plenty of
projects in 1990 that were not as far along as the Jamestown
Connector and had not yet received a conformity determination, as
did Jamestown, prior to the 1990 Amendments. Those projects may
have "come from" conforming Plans and TIPs at the time of the
Amendments, but the projects themselves had yet to receive a
determination of conformity. As a result, the grace period in
7506(c)(3)(B)(i) was enacted to address these types of
projects.

-36-

25 (interpreting 7506(c)(3) to apply only to projects that have

yet to receive conformity determinations); see also 58 Fed. Reg.

62190-91 (EPA and Department of Transportation regulations

holding that its Interim Guidance governs conformity

determinations made between 1990 and 1993). It is well

established that we afford considerable deference to an agency's

interpretation of a statute that it is primarily charged with

enforcing, especially a complicated one like the CAA. Puerto

Rican Cement Co. v. United States EPA, 889 F.2d 292 (1st Cir.

1989) (Courts give EPA's construction of the statute "controlling

weight" unless it is "plainly erroneous"); see also Chevron

United States, Inc. v. Natural Resources Defense Council, Inc.,

467 U.S. 837, 844-45 (1984); Larson, 2 F.3d at 466-69; Comit Pro

Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth., 888

F.2d 180, 186 (1st Cir. 1989), cert. denied, 494 U.S. 1029

(1990).

We realize that a result of this interpretation of the

CAA is that states may have conforming transportation projects

without having any conforming transportation plans or programs.

We see no problem with this outcome as long as federal government

support is limited to projects that were basically already on

their way to completion before the 1990 CAA Amendments.9 The

9 Although the FHWA did not authorize construction of the
Jamestown Connector until 1992 and the Corps did not issue its
permit to fill wetlands until 1992 as well, the final federal
environmental go-ahead for the project was given in 1988, and
Rhode Island had acquired much of the land for the project by
1990. See Conservation Law Found., 827 F. Supp. at 890.

-37-

plaintiffs' position, however, would result in a more absurd

situation -- a complete halt of all ongoing projects regardless

of how close to completion those projects have become. We see no

indication in the CAA that Congress intended such a result.

Affirmed.

-38-